**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| BLITZSAFE TEXAS, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 2:15-cv-1274-JRG-RSP |
| | § | [Lead Case] |
| HONDA MOTOR CO., LTD., ET AL., | § | |
| | § | |
| Defendants. | § | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

On July 1, 2016, the Court held a hearing to determine the proper construction of the disputed terms in U.S. Patent No. 7,489,786 ("the '786 Patent") and U.S. Patent No. 8,155,342 ("the '342 Patent") (collectively, the "Asserted Patents"). The Court has considered the arguments made by the parties at the hearing and in their claim construction briefs. (Dkt. Nos. 98, 101 & 106.) The Court has also considered the intrinsic evidence and made subsidiary factual findings about the extrinsic evidence. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005); *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015). The Court issues this Claim Construction Memorandum and Order in light of these considerations.

# TABLE OF CONTENTS

I.      BACKGROUND ................................................................................................. 3

II.     APPLICABLE LAW ......................................................................................... 5

III.    CONSTRUCTION OF AGREED TERMS ..................................................... 10

IV.     CONSTRUCTION OF DISPUTED TERMS ................................................. 11

        A.      Collateral Estoppel ............................................................................... 11

        B.      Disputed Constructions ........................................................................ 15

                1.      "interface" ................................................................................ 15

                2.      "integration subsystem" .......................................................... 23

                3.      "generated by the portable device over the wireless communication link for playing on the car audio/video system" ............................................................ 31

                4.      "device presence signal" ......................................................... 35

                5.      "maintaining . . . in a state responsive" / "maintain . . . in a state responsive" 40

                6.      "external" ................................................................................. 43

                7.      "portable" ................................................................................. 46

                8.      "pre-programmed" ................................................................... 48

                9.      "car stereo" / "car audio/video system" .................................. 51

                10.     "format incompatible with the [after-market audio device, MP3 player, portable device]" / "format incompatible with the [car stereo / car audio/video system]" ..................................................................................... 56

                11.     "video information" .................................................................. 59

                12.     "connector electrically connectable to" / "electrical connector" / "connectable" ........................................................................... 61

                13.     Claims 49 and 73 of the '342 Patent do not Claim Two Statutory Categories 65

V.      CONCLUSION ................................................................................................ 67

## I.     BACKGROUND

The '786 Patent is titled "Audio Device Integration System," and relates "to an audio device integration system for integrating after-market components such as satellite receivers, CD players, CD changers, MP3 players, Digital Audio Broadcast (DAB) receivers, auxiliary audio sources, and the like with factory-installed (OEM) or after-market car stereo systems." '786 Patent at col. 1, ll. 7–12. The '786 Patent was filed on December 11, 2002, and issued on February 10, 2009.

Claim 1 of the '786 Patent is an exemplary claim and recites the following elements (disputed term in italics):

> 1. An audio device integration system comprising:
> a first *connector electrically connectable to* a *car stereo*;
> a second *connector electrically connectable to* an after-market audio device *external* to the *car stereo*;
> a third *connector electrically connectable to* one or more auxiliary input sources *external* to the *car stereo* and the after-market audio device;
> an *interface* connected between said first and second *electrical connectors* for channeling audio signals to the *car stereo* from the after-market audio device, said *interface* including a microcontroller in electrical communication with said first and second *electrical connectors*, said microcontroller *pre-programmed* to execute:
> a first *pre-programmed* code portion for remotely controlling the after-market audio device using the *car stereo* by receiving a control command from the *car stereo* through said first connector in a *format incompatible with the after-market audio device*, processing the received control command into a formatted command compatible with the after-market audio device, and transmitting the formatted command to the after-market audio device through said second connector for execution by the after-market audio device;
> a second *pre-programmed* code portion for receiving data from the after-market audio device through said second connector in a *format incompatible with the car stereo*, processing the received data into formatted data compatible with the *car stereo*, and transmitting the

> formatted data to the *car stereo* through said first connector for display by the *car stereo*; and
>
> a third *pre-programmed* code portion for switching to one or more auxiliary input sources connected to said third *electrical connector*.

The '342 Patent is titled "Multimedia Device Integration System," and relates "to a multimedia device integration system for integrating after-market components such as satellite receivers, CD players, CD changers, digital media devices (e.g., MP3 players, MP4 players, WMV players, Apple iPod devices, portable media centers, and other devices), Digital Audio Broadcast (DAB) receivers, auxiliary audio sources, video devices (e.g., DVD players), cellular telephones, and other devices for use with factory-installed (OEM) or after-market car stereo and video systems." '342 Patent at col. 1, ll. 20–28. The '342 Patent is a continuation-in-part of the '786 Patent. The '342 Patent was filed on June 27, 2006, and issued on April 10, 2012.

Claim 1 of the '342 Patent is an exemplary claim and recites the following elements (disputed term in italics):

> 1. A multimedia device integration system, comprising:
>
> an *integration subsystem* in communication with a *portable* device, the *portable* device external to a *car audio/video system*; and
>
> a first *wireless interface* in communication with said *integration subsystem*, said first *wireless interface* establishing a wireless communication link with a second *wireless interface* in communication with the *car audio/video system*,
>
> wherein said *integration subsystem* obtains information about an audio file stored on the *portable* device, transmits the information over said wireless communication link to the *car audio/video system* for subsequent display of the information on a display of the *car audio/video system,* instructs the *portable* device to play the audio file in response to a user selecting the audio file using controls of the *car audio/video system*, and transmits audio *generated by the portable device over said wireless communication link to the car audio/video system for playing on the car audio/video system.*

## II.  APPLICABLE LAW

### A.  Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") (vacated on other grounds).

"The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's

meaning, because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks

the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alternatives, Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.* The Supreme Court recently explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871) (a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the "evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

> *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

## B. Departing from the Ordinary Meaning of a Claim Term

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution."[1] *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Solutions*, 750 F.3d at 1309.

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.") "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable."

---

[1] Some cases have characterized other principles of claim construction as "exceptions" to the general rule, such as the statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

*3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013); *see also Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1045 (Fed. Cir. 2016) ("When the prosecution history is used solely to support a conclusion of patentee disclaimer, the standard for justifying the conclusion is a high one.").

Although a statement of lexicography or disavowal must be exacting and clear, it need not be "explicit." *See Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1364 (Fed. Cir. 2016) ("a patent applicant need not expressly state 'my invention does not include X' to indicate his exclusion of X from the scope of his patent"). Lexicography or disavowal can be implied where, *e.g.*, the patentee makes clear statements characterizing the scope and purpose of the invention. *See On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006) ("[W]hen the scope of the invention is clearly stated in the specification, and is described as the advantage and distinction of the invention, it is not necessary to disavow explicitly a different scope."). Nonetheless, the plain meaning governs "[a]bsent implied or explicit lexicography or disavowal." *Trs. of Columbia Univ.*, 811 F.3d at 1364 n.2.

### C. Definiteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA) / § 112(b) (AIA) [2]

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. A claim, when viewed in light of the intrinsic evidence, must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). If it does not, the claim fails § 112, ¶ 2 and is therefore invalid as indefinite. *Id.* at 2124. Whether a claim is indefinite is determined from the perspective of one of ordinary skill in the art as of the time the application

---

[2] Because the Asserted Patents have an effective filing date before September 16, 2012, the effective date of the America Invents Act ("AIA"), the Court refers to the pre-AIA version of § 112.

for the patent was filed. *Id.* at 2130. As it is a challenge to the validity of a patent, the failure of any claim in suit to comply with § 112 must be shown by clear and convincing evidence. *Id.* at 2130 n.10. "[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012).

## III. CONSTRUCTION OF AGREED TERMS

The parties agreed to the constructions of the following terms/phrases:

| Claim Term/Phrase | Agreed Construction |
|---|---|
| "integration" / "integrating"<br><br>('786 Patent, claims 1, 5, 44, 57) | "Connecting one or more external devices or inputs to an existing car radio or stereo via an interface, processing and handling signals and audio channels, allowing a user to control the devices via the car stereo, and displaying data from the devices on the radio." |
| "auxiliary input source"<br><br>('786 Patent, claims 1, 14) | "a device that outputs audio by headphone jack or other connector" |
| "channeling audio signals" / "audio signals … are selectively channeled"<br><br>('786 Patent, claims 1, 14) | "receiving and transmitting audio" |
| "maintain … in an operational state"<br><br>('786 Patent, claim 57) | "maintain in a state responsive to processed data and audio signals from the external device" |
| "integration" / "integrating"<br><br>('342 Patent claims 49, 73) | "Connecting one or more external devices or inputs to an existing car stereo or video system via an interface, processing and handling signals, audio, and/or video information, allowing a user to control the devices via the car stereo or video system, and displaying data from the devices on the car stereo or video system." |

(Dkt. No. 111 at 9, 13, 15, 34, 41). In view of the parties' agreement on the proper construction of the identified terms, the Court hereby **ADOPTS** the parties' agreed constructions.

## IV.    CONSTRUCTION OF DISPUTED TERMS

The parties' dispute focuses on the meaning and scope of ten terms/phrases in the Asserted Patents.

### A.  Collateral Estoppel

Defendants argue Plaintiff is bound to prior constructions by collateral estoppel. (Dkt. No. 101 at 10-14). In March 2010, Marlowe Patent Holdings LLC ("MPH") brought suit in the District of New Jersey asserting infringement of the '786 Patent. *Marlowe Pat. Holdings LLC v. Dice Elecs. LLC et al.*, No. 3:10-cv-01199-PGS-DEA (D.N.J.) (the "*Dice* case"); *Marlowe Pat. Holdings LLC v. Ford Motor Co.*, No. 3:11-cv-07044-PGS-DEA (D.N.J.) (the "*Ford* case").[3] On January 16, 2015, the New Jersey court issued a 41-page claim construction opinion and 3-page claim construction order. (Dkt. Nos. 101-4 and 101-5). Both the *Dice* and *Ford* cases ended by June 2015. (Dkt. No. 244 in the *Dice* case; Dkt. No. 130 in the *Ford* case).

Defendants contend that Ira Marlowe, the named inventor on the '786 Patent and '342 Patent then assigned the Asserted Patents to Blitzsafe Texas, LLC (Plaintiff). (Dkt. No. 101 at 11) (citing Dkt. Nos. 101-6 and 101-7). On July 16, 2015, Plaintiff filed the first case against Defendant Honda. The Court consolidated all cases related to the Honda case for pretrial purposes on October 30, 2015. (Dkt. No. 25). Defendants contend Plaintiff challenges five constructions provided by the New Jersey court ("the *Ford* terms") and a sixth construction ("car stereo") the parties agreed on in the *Ford* case. (Dkt. No. 101 at 11). Defendants argue collateral estoppel applies to the constructions issued in the *Ford* case. (*Id.*) For the following reasons, the Court finds that collateral estoppel does not apply.

In a patent infringement case, Fifth Circuit law provides the standard for issue preclusion and Federal Circuit law provides the standard on substantive issues of patent law. *See Soverain*

---

[3] The '342 Patent was not part of the *Dice* or *Ford* Cases.

*Software LLC v. Victoria Secret Direct Brand Mgmt.*, 778 F.3d 1311, 1314 (Fed. Cir. 2015). The Fifth Circuit has held that collateral estoppel applies if: "(1) the issue under consideration is identical to that litigated in the prior action; (2) the issue was fully and vigorously litigated in the prior action; (3) the issue was necessary to support the judgment in the prior case; and (4) there is no special circumstance that would make it unfair to apply the doctrine." *Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387, 391 (5th Cir. 1998); *see Rabo Agrifinance, Inc. v. Terra XXI, Ltd.*, 583 F.3d 348, 353 (5th Cir. 2009) (listing three elements of collateral estoppel).

Defendants argue each element of collateral estoppel is met as to Plaintiff's claim construction arguments in this case. *First*, Defendants contend the claim construction issues in this case are identical to those in the *Ford* case. (Dkt. No. 101 at 11) (citing *e-Digital Corp. v. Futurewei Techs., Inc.*, 772 F.3d 723, 726 (Fed. Cir. 2014); *Mobile Telcoms. Techs., LLC v. ZTE (USA) Inc.*, 2016 U.S. Dist. LEXIS 48766 (E.D. Tex. Apr. 12, 2016)). Defendants acknowledge that three of the terms in the case were not in the *Ford* case. (Dkt. No. 101 at 11-12). However, Defendants say the consistent usage of the terms across related patents requires consistent constructions in "claims of common ancestry." (*Id.* at 12) (citing *Epcon Gas Sys. Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1030 (Fed. Cir. 2002)). *Second*, Defendants argue the *Ford* constructions were fully and vigorously litigated. (Dkt. No. 101 at 12). *Third*, Defendants argue the timing of the ultimate resolution of the prior cases shows the construction of the terms in the *Ford* case was necessary to support the judgment. (*Id.* at 12-13). *Finally*, Defendants contend that applying collateral estoppel is fair because Plaintiff is a successor in privity with MPH. (*Id.* at 13-14) (citing *Meza v. General Battery Corp.*, 908 F.2d 1262, 1266 (5th Cir. 1990)). Defendants specifically say that the Court should reach the same outcome the Federal Circuit reached in *e-Digital* because it would ensure the uniform treatment of patents across jurisdictions and would discourage forum shopping by litigants unhappy with prior rulings. (Dkt. No. 101 at

13).

The Court finds Defendants have not shown that Plaintiff's claim construction arguments are barred by collateral estoppel. "[A] party asserting preclusion bears the burden of showing 'with clarity and certainty what was determined by the prior judgment.'" *United Access Techs., LLC v. Centurytel Broadband Servs. LLC*, 778 F.3d 1327, 1331 (Fed. Cir. 2015) (quoting *Jones v. City of Alton, Ill.*, 757 F.2d 878, 885 (7th Cir. 1985)). When assessing whether a prior claim construction ruling has collateral estoppel effect, a court must determine if the party asserting estoppel has shown that a prior ruling on a claim term was a "critical and necessary part of the judgment." *Rabo*, 583 F.3d at 353.

Defendants have not shown that any ruling by the New Jersey court on any claim term was "critical and necessary" to the resolution of the *Dice* and *Ford* cases. At best, Defendants have shown that the New Jersey court construed an unknown one, or several, terms in a way that caused the parties in the *Dice* and *Ford* cases to settle. Since Defendants have not pointed to a specific claim term that was "critical and necessary" to those settlements, Defendants have not shown that collateral estoppel bars Plaintiff from arguing a claim term in this case. *Cf. e.Digital*, 772 F.3d at 726 ("On appeal, the parties only dispute whether construction of the sole memory limitation presents an identical issue."); *e.Digital Corp. v. Canon USA, Inc.*, Civil Action No.: 09-cv-02578-MSK-MJW, Dkt. No. 398, at *2 (D. Colo. July 28, 2011) ("e.Digital contends that the Order construes certain aspects of the 'sole memory' limitation of the '774 Patent, and although e.Digital disputes the Court's construction, it is prepared to stipulate to non-infringement of the asserted claims of the '774 Patent . . . .").

A long line of Fifth Circuit precedent supports this conclusion. For decades the Fifth Circuit has held that when an earlier decision rests on alternative grounds for relief, none of the grounds for relief can serve as a basis for invoking collateral estoppel. *See Hicks v. Quaker Oats*

*Co.*, 662 F.2d 1158, 1168–69 (5th Cir. 1981). This rule rests on the idea that when "alternative grounds" for relief exist, none of the grounds are strictly "necessary to the judgment." *See id.*; *Society of Separationists, Inc. v. Herman*, 939 F.2d 1207, 1214 n.25 (5th Cir. 1991) (citing *Hicks*, 662 F.2d 1168–73).

Here, even if the Court assumes the New Jersey court's claim construction order was the basis for the settlement in the *Dice* and *Ford* cases, the New Jersey court's construction of each claim term should be seen as an alternative basis for relief. As long-standing Federal Circuit precedent makes clear, any single construction can have a dispositive, or near-dispositive, effect on central issues such as the validity and infringement of a patent. Thus any construction by the New Jersey court could have served as the basis for the parties in the *Dice* and *Ford* cases to settle. *See Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310 (Fed. Cir. 2005) ("Literal infringement requires that each and every limitation set forth in a claim appears in the accused product."). In sum, the Court finds that Defendants have not shown that any specific claim construction ruling by the New Jersey court was "critical and necessary" to the settlement. Collateral estoppel does not bar Plaintiff from making its claim construction arguments in this case.[4]

---

[4] The Court does not address the issue of whether a settlement can even serve as the basis for invoking collateral estoppel in the first place.

**B. Disputed Constructions**

**1. "interface"**

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal[5] |
|---|---|---|
| "interface" | "a device configured to integrate an external device with a car stereo" | "a microcontroller that is a functionally and structurally separate component from the car stereo, which integrates an aftermarket device with a car stereo" |

**a) The Parties' Positions**

The parties agree that the recited "interface" is configured to integrate an external device with a car stereo. The parties dispute whether the recited "interface" must be separate from the recited "car stereo," as Defendants propose. Plaintiff argues that Defendants' construction should be rejected because it includes limitations which are inconsistent with and unsupported by the claim language and specification. (Dkt. No. 98 at 10). Plaintiff contends that Defendants' position—that the interface should be construed to be a microcontroller—is incorrect because the claims and specification do not limit the interface to a microcontroller alone. (*Id.*). Plaintiff argues that the claims state the interface includes a microcontroller, but does not limit the interface to only a microcontroller. (*Id.*). According to Plaintiff, the specification describes the interface as including additional components such as ports, circuits, resistors, diodes, capacitors, and oscillators. (*Id.*) (citing '786 Patent at col. 9, ll. 9–20).

Plaintiff further argues that the intrinsic record does not require the interface be "functionally and structurally separate" from the car stereo. (*Id.*). Plaintiff contends Defendants seek to import a limitation into the claims that was adopted by the court in the *Ford* case based

---

[5] The defendants in this case have indicated that unless otherwise noted, "Defendants" include Honda, Hyundai, Kia, Nissan, and Toyota. (Dkt. No. 111 at 9 n.1). Defendant Volkswagen has indicated that it joins Defendants' constructions of "interface" and "car stereo" only and does not propose constructions for the remainder of the disputed terms. (*Id.*).

on erroneous readings of two aspects of the specification and prosecution history. (*Id.* at 10-11). According to Plaintiff, the court in the *Ford* case overlooked the evidence in the specification establishing that the patentee did not intend for the blocks in Figure 2A to connote structural or functional separation. (*Id.* at 11). Plaintiff also argues that the court in the *Ford* case erroneously interpreted the amendment of the claims of the '786 Patent during prosecution to recite the first, second, and third connectors as conceding structural and functional separation between the interface and car stereo. (*Id.*). Plaintiff contends that nothing in the prosecution history indicates the amendment of the claims to include a first connector excludes any possible structural or functional overlap between the interface and car stereo. (*Id.* at 12).

Defendants respond that the claim language itself requires the interface to be physically separate from the car stereo. (Dkt. No. 101 at 14-15). Defendants argue the '786 Patent specification describes the interface as separate from the car stereo. (*Id.* at 15) (citing '786 Patent at col. 1, ll. 36–44, col. 1, ll. 60–63). According to Defendants, the interface is a separate, after-market translator between an existing car stereo and an incompatible after-market audio device. (Dkt. No. 101 at 15). Defendants argue that if the interface were a native component in the car stereo, there would be no incompatibility and the after-market device would not be alien to the existing car stereo. (*Id.*).

Defendants also argue the patentee admitted that the interface disclosed in the '786 Patent is not within the car stereo when it applied for a patent in Singapore. (*Id.* at 15-16) (citing Dkt. No. 101-11 at 3). Defendants contend their construction is consistent with the arguments made during prosecution of the '786 Patent. (Dkt. No. 101 at 16). Defendants further contend the patentee repeatedly argued the claimed interface was between (*i.e.*, separate and distinct from) the car stereo and after-market device. (*Id.*) (citing Dkt. No. 101-12 at 5, Dkt. No. 101-13 at 12).

Defendants argue the examiner relied on the patentee's distinctions and later distinguished another prior art reference (Owens) because it only disclosed a microprocessor in the car stereo rather than within an interface. (Dkt. No. 101 at 16) (citing Dkt. No. 101-14 at 5). Defendants argue that the patentee differentiated the interface from a car stereo "specifically designed" or "custom-designed" for use with an after-market device. (Dkt. No. 101 at 16-17) (citing Dkt. No. 101-13 at 12).

Regarding the *Ford* case, Defendants argue that the New Jersey court's construction does not preclude the interface from including other components. (Dkt. No. 101 at 17). Defendants argue the construction requires the interface to include at least a microcontroller that is functionally and structurally separate from the car stereo. (*Id.*). Regarding Plaintiff's argument that the prior court erred by interpreting FIG. 2A and the prosecution history to require functional and structural separation, Defendants contend the court in the *Ford* Case relied on FIG. 2A for the conclusion that the elements are functionally separated. (*Id.*) (citing Dkt. No. 101-4 at 11). Defendants argue the physical separation was required by the plain language of the claim as well as the prosecution history. (Dkt. No. 101 at 17).

Plaintiff replies that Defendants are suggesting that the interface must be connected to the car stereo solely by the first connector such that the interface is a discrete box that shares no other connection or circuitry with the car radio. (Dkt. No. 106 at 8). Plaintiff contends this reading ignores the transitional term "comprising," which allows for the claimed apparatus to contain elements not set forth in the claim. (*Id.*). Plaintiff also argues that the portion of the specification cited by Defendants does not support the conclusion that the patented interface must be physically and structurally separate from the car stereo. (*Id.*) (citing '786 Patent at col. 1, ll. 36–44). According to Plaintiff, the claims do not exclude an embodiment where the interface

circuitry is installed behind the dashboard, either at production time or thereafter, to integrate a car stereo with after-market audio devices that would otherwise be incompatible with the car stereo. (Dkt. No. 106 at 8). Plaintiff further argues that the claims do not state the interface must be external to the car stereo. (*Id.*)

Regarding Defendants' argument that the interface must be a separate, after-market device, Plaintiff argues the reason that the car stereo would not be incompatible with the after-market device is because of the inclusion of an interface, not its location or the time of its installation. (*Id.*). Turning to Defendants' argument regarding the prosecution history, Plaintiff contends the patentee's statements regarding the Miyazaki, Falcon, and Kunimatsu references were made specifically in relation to the claimed "device presence signal," not the location or structure of the interface. (*Id.* at 9) (citing Dkt. No. 101-13 at 35–36). Plaintiff further contends that the patentee's descriptions of "specifically designed" and "custom designed" were used in reference to the electric equipment units disclosed by the Miyazaki reference, not to differentiate the interface from a car stereo. (Dkt. No. 106 at 9).

Plaintiff also argues that Defendants' reliance on the statements made to the Intellectual Property Office of Singapore is misplaced. (*Id.*) Plaintiff contends that whether the claims of that Singapore patent were allowable over the disclosure of the '786 Patent (under Singapore law) is a different issue from whether the '786 patent claims may include that embodiment when the claim language is broad enough to encompass it. (*Id.*) (citing *AIA Eng'g Ltd. v. Magotteaux Int'l S.A.*, 657 F.3d 1264, 1279 (Fed. Cir. 2011)).

For the following reasons, the Court finds that the term **"interface"** should be construed to mean **"a device that includes a microcontroller and that is a functionally and structurally separate component from the car stereo, which integrates an external aftermarket device**

**with a car stereo."**

        **b) Analysis**

The term "interface" appears in claims 1, 5, 6, 10, 14, 57, and 64 of the '786 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. As an initial matter, the parties agree that the recited "interface" is configured to integrate an external device with a car stereo. This is consistent with the specification, which states "the interface 20 of the present invention allows for the integration of a multitude of devices and inputs with an OEM or after-market car radio or stereo." '786 Patent at col. 5, ll. 33–36. The intrinsic evidence also indicates that the "interface" recited in the claims of the '786 Patent is not the same as the "wireless interface" recited in the claims of the '342 Patent.

Regarding the remaining dispute, the claim language shows the interface is a functionally and structurally separate component from the car stereo. Independent claims 1 and 57 both recite first and second electrical connectors respectively connectable *to a car stereo* and an after-market audio device, in addition to "an *interface* connected *between* said first and second electrical connectors for channeling audio signals to *the car stereo* from *the after-market audio device*." '786 Patent at claim 1 (emphasis added). As noted by the court in the *Ford* case, "[h]aving such first, second, and third electrical connectors between the interface, car stereo, and an after-market device indicates to one of ordinary skill in this field of technology the ***physical and structural separation*** between the interface and the car stereo." (Dkt. No. 101-4 at 14) (emphasis in original).

The '786 Patent specification also describes the interface as separate from the car stereo. The specification states: "a particular problem with integrating after-market audio systems with

*existing car stereos* is that signals generated by the car stereo is in a proprietary format, and is not capable of being processed by the after-market system." '786 Patent at col. 1, ll. 36–39 (emphasis added). The specification further states: "it would be desirable to provide an integration system that not only achieves integration of various audio devices that are *alien* to a given OEM or after-market stereo system, but also allows for information to be exchanged between the after-market device and the car stereo." *Id.* at col. 1, ll. 60–64. Given the problem statement and the desired solution in the specification, a person of ordinary skill in the art would understand that the interface is a functionally and structurally separate component from the car stereo.

Indeed, the Summary of the Invention states that "the present invention" relates to an integration system that "*connects to* and interacts with the car stereo *at any available port of the car stereo*, such as a CD input port, a satellite input, or other known type of connection." *Id.* at col. 2, ll. 26–29. Every embodiment in the specification illustrates the recited interface with ports or connectors for connecting to an existing car radio. For example, when referring to Figure 3a the specification states that "[a] plurality of ports J1C1, J2A1, X2, RCH, and LCH are provided for allowing connection of the interface system of the present invention between an existing car radio, an after-market CD player or changer, or an auxiliary input source." *Id.* at col. 8, ll. 33–37; *see also id.* at col. 9, ll. 29–32 (referring to Figure 3b), col. 10, ll. 36–40 (referring to Figure 3c), col. 11, ll. 21–24 (referring to Figure 3d).

The prosecution history further confirms the patentee understood the claimed "interface" to be a functionally and structurally separate component from the car stereo. Specifically, the patentee argued that the prior art (Falcon) is "an entirely different concept than the interface of the present invention, which includes *a physical interface device connected between* a car stereo

system and an external audio source (e.g., a plurality of auxiliary input sources)." (Dkt. No. 101-12 at 5) (emphasis added). Similarly, the patentee argued the prior art (Mizazaki) lacked "any disclosure relating to an interface for integrating external, after-market devices for use with an existing car stereo." (Dkt. No. 101-13 at 12). The patentee further argued the prior art (Mizazaki) "clearly is not an interface positioned *between* and in communication with an after-market, external device and a car stereo…" (101-13 at 12) (emphasis added).

Plaintiff contends that "[n]othing in the prosecution history . . . excludes any possible structural or functional overlap between the interface and car stereo." (Dkt. No. 98 at 12). This contradicts the arguments made by the patentee during prosecution and the claims themselves, which require a functionally and structurally separate component from the car stereo. To the extent Plaintiff argues that the claimed "interface" and the car stereo are not functionally and structurally separate, the Court rejects this argument.

However, the Court's finding that the "interface" must be functionally and structurally separate from the "car stereo" does not mean the claims necessarily exclude an interface that, for example, is installed behind the dashboard, either at production time or thereafter. The Court's construction does not require the interface to be external to the "car stereo," or physically separate from the "physical devices" that make-up the "car stereo." '786 Patent at col. 5, ll. 1–13. Furthermore, the claims do not require a specific type of connector or connection between the interface and the car stereo. Instead, the intrinsic evidence just says that the "interface" must be functionally and structurally separate from the components or sub-components that make up the "car stereo."

Finally, the Court finds the "interface" does not need to be construed as a microcontroller alone and that the "interface" can include other components. The claims and specification do not

limit the "interface" to a microcontroller alone. (Dkt. No. 98 at 10). The "interface," however, must include at least a microcontroller that is functionally and structurally separate from the car stereo. This is consistent with the intrinsic evidence. The claim language requires the interface to include at least a microcontroller. *See, e.g.*, '786 Patent at claims 1, 57. Furthermore, every embodiment of the "interface" described in the specification includes its own microcontroller that "contains processing logic." '786 Patent at col. 7, ll. 46–47. For example, the specification states "[m]icrocontroller U1 is in electrical communication with each of the ports J1C1, J2A1, and X2, and provides functionality for integrating the CD player or auxiliary input source connected to the ports J2A1, X2, RCH, and LCH." '786 at col. 8, ll. 46–49; *see also id.* at col. 9, ll. 45–67 (referring to Figure 3b), col. 10, l. 49–col. 11, l. 3 (referring to Figure 3c), col. 11, ll. 30–46 (referring to Figure 3d).

The specification further states "microcontroller U1 receives control commands, such as button or key sequences, initiated by a user at control panel of the car radio and received at the connector J1C1, processes and formats same, and dispatches the formatted commands to the CD player or auxiliary input source via connector J2Al." '786 Patent at col. 8, ll. 50–55. After considering the intrinsic record, a person of ordinary skill in the art would understand that the recited "interface" is "a device that includes a microcontroller and that is a functionally and structurally separate component from the car stereo." Indeed, the examiner distinguished a prior art reference (Owens) because it only disclosed a microprocessor *within the car stereo* rather than within an interface. (Dkt. No. 101-15 at 5).

### c) Court's Construction

The Court construes the term **"interface"** to mean **"a device that includes a microcontroller and that is a functionally and structurally separate component from the**

**car stereo, which integrates an external aftermarket device with a car stereo.”**

### 2. “integration subsystem”

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| “integration subsystem” | “one or more components of a system or device configured to integrate an external device with a car audio/video system”<br><br>If the Court determines that this term is governed by 35 U.S.C. § 112, ¶ 6, Blitzsafe agrees with Defendants' recitation of the function of this term, and identifies the following exemplary “structure(s), act(s), or material(s)” that may correspond to this term: See, e.g., '342 Patent, Figs 3A–D, 4A–G, 10–24; 12:58–16:29; 16:40–24:47; 28:7–38:48. | Subject to 35 U.S.C. § 112(6) Indefinite. Alternatively, “a microprocessor programmed to perform the method of FIG. 24” |

### a) The Parties' Positions

The parties dispute whether the term “integration subsystem” should be interpreted as a means-plus-function limitation under 35 U.S.C. § 112(6). Defendants argue that it should, and contend the claims containing the “integration subsystem” term are indefinite because the '342 Patent fails to disclose sufficient structure corresponding to the claimed functions. Plaintiff contends the claims specify the integration subsystem is configured to perform specific tasks that integrate an external device with a car audio/video system. (Dkt. No. 98 at 13) (citing '342 Patent at col. 42, ll. 37–47, col. 44, ll. 12–14).

Plaintiff further argues the '342 Patent specification defines “integration” as a set of tasks performed by an interface. (Dkt. No. 98 at 13) (citing '342 at col. 8, l. 64–col. 9, l. 3). Plaintiff contends since the claimed integration subsystem performs the integration tasks, an integration subsystem must be a type of interface. (Dkt. No. 98 at 14). Plaintiff further argues that the two

terms are not identical because while an interface is simply "a device configured to integrate an external device with a car stereo," an "integration subsystem" is structured specifically as a "subsystem." (*Id.*). Plaintiff contends that in nearly all of the claims of the '342 Patent, the "integration subsystem" is a subsystem of either the external device or the car audio/video system. (*Id.*). According to Plaintiff, by substituting the structure of a subsystem for the term "device" in the construction of "interface," the proper construction of "integration subsystem" is determined to be "one or more components of a system or device configured to integrate an external device with a car audio/video system." (*Id.*).

Regarding Defendants' contention that the "integration subsystem" is subject to 35 U.S.C. § 112, ¶ 6 and indefinite under § 112, ¶ 2, Plaintiff argues the term "integration subsystem" is not subject to 35 U.S.C. 112, ¶ 6. (*Id.* at 15). Plaintiff contends that none of the claims of the '342 Patent, including those reciting the phrase "integration subsystem," use the word "means." (*Id.*) (citing *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015)). Plaintiff further contends that Defendants cannot overcome the presumption against the application of § 112, ¶ 6. (Dkt. No. 98 at 15).

Plaintiff argues there are several instances in the public record where "integration subsystem" has been found to connote sufficient structure. (*Id.*). Plaintiff contends the Patent Trial and Appeal Board (the "PTAB"), in Denying Institution of Inter Partes Review IPR2016-00118 against the '342 Patent, agreed with Blitzsafe and found that "integration subsystem" "must serve the purpose of 'integrating' and must be a 'subsystem' as described in the '342 Patent and as recited in the claims." (*Id.*) (citing Dkt. No. 98-2 at 11). Plaintiff argues that in the inter partes review ("IPR") Petition, the Petitioner, Unified Patents, Inc., did not ask the PTAB to construe "integration subsystem" as means-plus-function term, but instead presented the PTAB

with a structural construction.[6] (Dkt. No. 98 at 16). Plaintiff further argues its expert, Mr. McAlexander, confirms that one of ordinary skill in the art would have understood that an "integration subsystem" is a name for a structure. (*Id.*) (citing Dkt. No. 98-4 at ¶¶ 23-25).

In the alternative, Plaintiff argues even if the term "integration subsystem," was found to be defined solely by its function, Defendants have not proven by clear and convincing evidence that the claim is invalid under 35 U.S.C. 112(2). (Dkt. No. 98 at 16). Plaintiff contends that Figure 24 describes an algorithm that details the operation of the integration subsystem, and provides a sufficiently definite structure for all alleged functions (*Id.* at 15-16). According to Plaintiff, Figure 24 is the type of "outline of an algorithm, a flowchart, or a specific set of instructions or rules" that satisfies the requirement for "computer-implemented" mean-plus-function terms. (*Id.* at 17) (citing *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (overruled on other grounds)).

Plaintiff argues that it its expert, Mr. McAlexander, confirms that one of ordinary skill in the art would readily understand how to implement the algorithm from the disclosure of Figure 24 to accomplish the alleged functions. (Dkt. No. 98 at 17) (citing Dkt. No. 98-4 at ¶¶ 26-31). Plaintiff further contends to the extent that any alleged functions may require an algorithm, these alleged functions are supported by algorithms and specific source code found in the specification. (Dkt. No. 98 at 17-18) (citing '342 Patent at col. 22, ll. 7–16, col. 22, ll. 60–67, col. 15, ll. 3–6, col. 15, ll. 8–21, col. 16, ll. 1–5; Dkt. No. 98-4 at ¶¶ 32-33).

Defendants respond that the term "integration subsystem" is not recognized by persons of

---

[6] Plaintiff argues that Unified Patents itself is a trade organization whose Automotive Zone is funded by Toyota and Honda. (Dkt. No. 98 at 16). Defendants respond by arguing that members of Unified Patents have no input, control or advanced knowledge of the positions taken by Unified Patents in its *inter partes* review petitions. (Dkt. No. 101 at 27 n.11). According to Defendants, Unified Patents acts independently of its members. (*Id.*).

ordinary skill in the art as the name of a definite structure. (Dkt. No. 101 at 24). Defendants argue claims 49 and 73 do not include any structural limitations for performing the claimed functions of the recited integration subsystem. (*Id.*). According to Defendants, the claimed "integration subsystem" must be construed under 35 U.S.C. § 112(6). (*Id.*).

Defendants agree the patentee defined "integration" in the '342 Patent specification. (*Id.* at 25) (citing '342 Patent at col. 8, l. 64–col. 9, l. 3). Defendants argue Plaintiff misreads this definition to mean that "integration" includes an "interface," when instead, it describes using an interface (*i.e.*, "via an interface"). (Dkt. No. 101 at 25). Defendants contend the specification indicates the interface is a separate element from the integration subsystem. (*Id.*). Defendants also contend the claims consistently recite the integration subsystem as a separate element from the "interface" that establishes the wireless communication. (*Id.*). Defendants argue that Plaintiff's suggestion to equate the two elements would be legally improper. (*Id.*) (citing *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1579 (Fed. Cir. 1996)). Defendants further argue "system" is a generic, nonce term subject to means-plus-function interpretation. (Dkt. No. 101 at 26-27). Defendants also argue that the PTAB did not invoke 35 U.S.C. § 112(6) in IPR because neither party to that proceeding proposed a means-plus-function interpretation. (Dkt. No. 101 at 27).

Defendants argue claims 49 and 73 essentially recite the functions performed by the integration subsystem. (*Id.* at 28). Defendants contend the term "integration subsystem" is first used in the '342 Patent specification in relation to the embodiments illustrated in Figures 18-24. (*Id.*) (citing '342 Patent at col. 33, l. 43–col. 38, l. 67, Figure 24). According to Defendants, the structure in the specification that is linked to the claimed "integration subsystem" is a microprocessor programmed to perform the method of Figure 24. (Dkt. No. 101 at 28).

Defendant argue that the "obtains . . . information about an audio file" in claims 49 and 73 is at best encompassed only by step 1460 in FIG. 24. (*Id.* at 29). Defendants contend a one-step algorithm that restates the claimed function does not constitute sufficient corresponding structure for a computer-implemented function recited in a claim. (*Id.*). According to Defendants, the claimed integration subsystem lacks sufficient corresponding structure in the specification for performing the function, and is therefore indefinite under 35 U.S.C. § 112(2). (*Id.*). Regarding Plaintiff's argument that the the claimed "obtaining" is not computer-implemented and thus does not require an algorithm, Defendants argue this step is encompassed by step 1460 of Figure 24, which is implemented by a programmed microprocessor, *i.e.*, computer-implemented. (*Id.*) (citing '342 Patent at col. 34, l. 63–col. 35, l. 1).

Plaintiff replies that Defendants' contention that "integration subsystem" does not recite sufficiently definite structure or recites a function without reciting sufficient structure for performing that function is inconsistent with the claim language and specification of the '342 Patent. (Dkt. No. 106 at 13). Plaintiff argues that claim 49 recites "an integration subsystem in communication with a car audio/video system," which is a typical construct for a structural limitation, not a means-plus function limitation. (*Id.*). Plaintiff contends that the supposed "functions" of the integration subsystem are claimed as part of a wherein clause later in the claim and are not written as gerunds (*e.g.*, "wherein the integration subsystem obtains"). (*Id.*). Plaintiff further argues the specification describes the structure of the integration subsystem. (*Id.*) (citing '342 Patent at col. 34, l. 63–col. 35, l. 1, col. 14, ll. 27–59). According to Plaintiff, the integration subsystem is thus described as a discrete structure comprised of multiple structural components, and not as a "black box" as was the "distributed learning control module" in *Williamson*. (Dkt. No. 106 at 14).

Plaintiff further argues that Defendants confuse the "interface" of the '768 Patent with the "wireless interface" of the '342 Patent. (*Id.*). Plaintiff contends these are distinct components. (*Id.*). Plaintiff argues the wireless interfaces in the '342 Patent are components of the car audio video system and portable device that establish a wireless communication link between those devices. (*Id.*) (citing '342 Patent at col. 42, ll. 32–36). Plaintiff contends the wireless interface is not the "interface" that performs the "integration" that is the core of the claimed inventions. (Dkt. No. 106 at 14) (citing '342 Patent at col. 8, l. 64–col. 9, l. 3).

In the alternative, Plaintiff argues that if "integration subsystem" is governed by § 112(6), Figure 24 is sufficient structure to implement the four alleged functions of the integration subsystem. (Dkt. No. 106 at 14). Plaintiff contends that Figure 24 is a flowchart that shows the processing logic implemented by the integration subsystem. (*Id.*) Plaintiff argues this algorithm indicates that the integration subsystem obtains information about an audio file from the portable device in step 1460. (*Id.* at 15). Plaintiff further contends the specification confirms that "[i]n step 1460, data generated by the portable audio and/or video device is processed by the protocol conversion software block" in the integration subsystem. (*Id.*) (citing '342 Patent at col. 38, ll. 32–34). According to Plaintiff, this algorithm is sufficient support for the claimed functions from the view of a person or ordinary skill in the art. (Dkt. No. 106 at 15). Plaintiff further argues the flowchart in Figure 24 discloses an algorithm that encompasses all of the functions of the integration subsystem, which makes *Encyclopaedia Britannica, Inc. v. Alpine Electronics, Inc.*, 355 F. App'x 389 (Fed. Cir. 2009) inapposite. (*Id.*).

For the following reasons, the Court finds that the term **"integration subsystem"** should be construed to mean **"a subsystem that includes a microcontroller configured to integrate an external device with a car audio/video system."**

**b) Analysis**

The term "integration subsystem" appears in claims 49, 53, 54, 56, 57, 66, 70, 73, 77, and 78 of the '342 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The Court further finds that the term "integration subsystem" should not be interpreted as a means-plus-function limitation under 35 U.S.C. § 112(6). None of the claims of the '342 Patent, including those reciting the phrase "integration subsystem," use the word "means." The absence of the term "means" creates a presumption against the application of § 112, ¶ 6 that must be overcome by a preponderance of the evidence. *See Williamson v. Citrix Online*, LLC, 792 F.3d 1339, 1349 (Fed. Cir. 2015). Defendants have not overcome the presumption.

Claim 49 recites "an integration subsystem in communication with a car audio/video system," which is a typical construct for a structural limitation, not a means-plus function limitation. Moreover, the specification describes the structure of the integration subsystem as follows:

> The integration subsystem 932 contains circuitry similar to the circuitry disclosed in the various embodiments of the present invention discussed herein, and could include a PIC16F872 or PIC16F873 microcontroller manufactured by Microchip, Inc. and programmed in accordance with the flowchart discussed below with respect to FIG 24.

'342 Patent at col. 34, l. 63–col. 35, l. 1. The specification further states the "embodiments of the present invention discussed herein" include, for example, the interface disclosed in Figure 3b and discussed in the specification as including the same 16F872 microcontroller, along with multiplexer/demultiplexer, resistors, capacitors, transistors, transformers, amplifiers, an oscillator and other components. '342 Patent at col. 14, ll. 27–59. This description of the "integration subsystem" in the specification suggests that it is a discrete structure comprised of multiple structural components and not a "black box" like the "distributed learning control

module" in *Williamson*. Indeed, the Federal Circuit has held that "circuitry" connotes structure to those in the electronic arts in the context of § 112 ¶ 6 analysis. *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1320 (Fed. Cir. 2004); *Mass. Inst. of Tech. v. Abacus Software*, 462 F.3d 1344, 1355 (Fed. Cir. 2006); *Apex Incl. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1373 (Fed. Cir. 2003). Accordingly, Defendants have not established that the "integration subsystem," which contains circuitry, fails to connote structure.

The Court also agrees with Plaintiff that Defendants improperly equated the "interface" of the '768 Patent with the "wireless interface" of the '342 Patent. The wireless interfaces in the relevant claims of the '342 Patent are components of the car audio video system and portable device that establish a wireless communication link between those devices. *See, e.g.*, '342 Patent at col. 42, ll. 32–36. The wireless interface is not the "interface" that performs the "integration" in the claims. *See, id.* at col. 8, ll. 64–9, l. 3.

Having found that the term is not subject to 35 U.S.C. § 112(6), the Court finds that the specification indicates the "integration system" is a subsystem configured to integrate an external device with a car audio/video system. The specification states "[t]he multimedia device integration system 540, in the form of a circuit board, is housed within the base portion 530 and performs the integration functions discussed herein for integrating the portable device 520 with an existing car stereo or car video system." '342 Patent at col. 27, ll. 26–30. The specification further states the "integration system" includes a microcontroller. *See, e.g.*, '342 Patent at col. 34, l. 63–col. 35, l. 1 ("The integration subsystem 932 contains circuitry similar to the circuitry disclosed in the various embodiments of the present invention discussed herein, and could include a PIC16F872 or PIC16F873 microcontroller manufactured by Microchip, Inc. and programmed in accordance with the flowchart discussed below with respect to FIG 24.").

However, unlike the "interface" in the '786 Patent, the intrinsic evidence does not show the "integration subsystem" has to be a functionally and structurally separate component from the "car stereo." Indeed, the '342 Patent indicates that the "integration system" can be included in either the portable device or the car stereo. *See, e.g.*, '342 at col. 34, ll. 9–13 ("The portable device 924 includes . . . an integration subsystem or module 932 positioned within the portable device 924."), col. 35, ll. 23–25 ("In this embodiment, the integration subsystem 1032 is positioned internally within the car system 1010."). Finally, in reaching its conclusion, the Court has considered the extrinsic evidence submitted by the parties, and given it its proper weight in light of the intrinsic evidence.

### c) Court's Construction

The Court construes the term **"integration subsystem"** to mean **"a subsystem that includes a microcontroller configured to integrate an external device with a car audio/video system."**

### 3. "generated by the portable device over the wireless communication link for playing on the car audio/video system"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "generated by the portable device over the wireless communication link for playing on the car audio/video system" | "produced by the portable device during playback" | "produced by the portable device during playback as decoded audio signals without further decoding before being output through the car audio/video system" |

### a) The Parties' Positions

The parties agree "generated by the portable device" means "produced by the portable device." The parties dispute whether that claim language also requires the signal to be generated "as decoded audio signals without further decoding before being output through the car audio/video system." Plaintiff argues that in addressing an IPR challenging the '342 Patent, the

PTAB agreed with Blitzsafe that the "audio generated by the portable device" limitation requires the audio file be played on the portable device. (Dkt. No. 98 at 21) (citing Dkt. No. 98-2 at 20-21). Plaintiff argues the PTAB found that the "audio generated by the portable device" limitation is not met where an audio file is transferred from the portable device to the car audio/video system and played by the car audio/video system, as disclosed in the prior art. (*Id.*)

Defendants respond the additional language in their construction comes from Blitzsafe's arguments to the PTAB to distinguish the '342 Patent from prior art. According to Defendants, Blitzsafe argued that the claims require audio to be received by the integration subsystem from the portable device as decoded audio signals. (Dkt. No. 101 at 32). Defendants argue that the specification makes clear that the "audio" generated by the portable device are audio signals. (*Id.* at 33) (citing '342 Patent at col. 35, ll. 62–65, col. 38, ll. 37–40).

Defendants also argue that Plaintiff's arguments in the IPR further require that the audio signals be decoded audio signals. (Dkt. 101 at 33). Defendants contend that Plaintiff argued the prior art (Ohmura) did not teach "audio generated by the portable device" as claimed. (*Id.*). Defendants further contend Plaintiff argued that Ohmura's "music data" was a music file, and the portable apparatus merely transferred the music file to the audio apparatus, before being reproduced as "audio" by the audio apparatus and output from its speakers. (*Id.*) (citing Dkt. No. 101-22 at 30). According to Defendants, Plaintiff argued the audio apparatus "generated" the audio, rather than the portable apparatus. (Dkt. No. 101 at 34).

Defendants further argue that in a response to an IPR petition filed by Toyota, Plaintiff argued "generated by the portable device" means "decoded by the portable device." (Dkt. No. 101 at 34) (citing Dkt. No. 101-25 at 28-29). Defendants contend that Plaintiff argued that the streaming audio "content" transmitted from the portable device in the prior art (Clayton) was not

"audio generated by the portable device" because it had to be decoded by the wireless adaptor before being output through the car audio system. (Dkt. No. 101 at 34) (citing Dkt. No. 101-25 at 28-29, 32). According to Defendants, Plaintiff distinguished transmitting an audio file or a stream of audio content from decoding audio signals. (Dkt. No. 101 at 34). Defendants argue that the proper construction must be no broader than Blitzsafe's construction before the PTAB, which equated "generating" audio to producing decoded audio signals. (*Id.* at 35).

Plaintiff replies that Defendants misstate Blitzsafe's statements in the IPRs. (Dkt. No. 106 at 16). Plaintiff argues that in response to Unified's IPR Petition, Blitzsafe explained that the disclosure of the Ohmura reference "merely allows a user to select an audio file from a list of audio files and is silent as to where audio is generated." (*Id.*). According to Plaintiff, Blitzsafe never represented to the PTAB that there is no "further decoding before being output through the car audio/video system" (*Id.*). Plaintiff contends that Blitzsafe argued that mere downloading is insufficient because the audio has to be "generated on the portable device," but never indicated that the data cannot be further decoded, or that all decoding must be performed by the portable device. (*Id.*)

For the following reasons, the Court finds that the phrase **"generated by the portable device over the wireless communication link for playing on the car audio/video system"** should be construed to mean **"produced by the portable device as decoded audio signals for playing on the car audio/video system."**

### b) Analysis

The phrase "generated by the portable device over the wireless communication link for playing on the car audio/video system" appears in claims 49 and 73 of the '342 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same

general meaning in each claim. The Court further finds that Plaintiff clearly and unambiguously stated in the Toyota IPR that the audio must be decoded by the portable device. Specifically, Plaintiff argued that "[t]hese limitations require that the portable device contain structure that converts the audio file into audio 'generated' on the device, *i.e.* audio decoded by the portable device." (Dkt. 101-25 at 28). In characterizing the prior art, the patent holder stated the following:

> "Content" is not audio generated by a portable device, rather it is described by Clayton as "media files, such as MP3 files, other types of audio files, video files, textual music play lists, and other types of files." Ex. 1002 at ¶ 0014. This content is decoded (i.e. converted form data such as MP3 into "generated" audio) only in the "content decoder 446" which is contained within the "wireless adapter 173," and, therefore, not in the portable device. Thus, the disclosure cited by Petitioner teaches, at best, a system where audio files are stored on a portable device and sent, as data, to the wireless adapter 173 to be later decoded into generated audio.

(101-25 at 29), *see also id.* at 32 (arguing that because a "stream decoder" was present in the adaptor rather than in the portable device, the portable device did not "generate" audio). The Court finds that in the passage above, Blitzsafe explicitly argued the portable device has to send decoded audio signals.

The specification also explains that "[a]udio and video signals generated by the portable device 1124 are channeled by the integration subsystem 1132 to the system electronics 1112, for playing through the car system 1110." '342 Patent at col. 35, ll. 62–65. The specification states audio signals generated by the portable device are channeled to the car audio/video system using a "wireless link." *Id.* at col. 38, ll. 37–40. Thus, even though the '342 Patent does not offer an express definition of "generated by the portable device," it makes clear that the "audio" generated by the portable device, as recited in the claims, are audio signals. Given this and Blitzsafe's statements during the IPR, the Court construes the phrase to mean "produced by the portable device as decoded audio signals for playing on the car audio/video system."

However, the Court finds that Blitzsafe did not clearly and unambiguously state that no additional decoding can be done to the data "before being output through the car audio/video system." Blitzsafe argued that the prior art did not disclose a system where audio files were at least decoded by the portable device. Blitzsafe's arguments mean that in the claimed invention the portable device must decode any audio files. However, Blitzsafe's arguments about the prior art do not mean that in the claimed invention no decoding can be done after the portable device has decoded the audio files. Indeed, the specification states that in some cases, the integration subsystem "receives data generated by the device electronic," and processes the data "into a format compatible with the car system 910." '342 Patent at col. 34, ll. 31–38. The Court reads that part of the specification to teach that the "integration subsystem" can perform additional processing on "data" after it is received from the portable device.

### c) Court's Construction

The Court construes the phrase **"generated by the portable device over the wireless communication link for playing on the car audio/video system"** to mean **"produced by the portable device as decoded audio signals for playing on the car audio/video system."**

### 4. "device presence signal"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "device presence signal" | Plain meaning, or "a signal indicating an audio device is present" | "a continuous signal indicating an audio device is present" |

### a) The Parties' Positions

The parties dispute whether the "device presence signal" has to be continuous, as Defendants propose. Plaintiff argues the meaning of the term "device presence signal" is clear to a person of ordinary skill in the art in view of the express language of the asserted claims and the specifications of the asserted patents. (Dkt. No. 98 at 24) (citing '786 Patent at col. 22, ll. 14–15;

'342 Patent at col. 43, ll. 7–9). Plaintiff contends that the specification of the '786 Patent says that "the present invention generates a signal that is sent to the car stereo to keep same in an operational state and responsive to external data and signals." (Dkt. No. 98 at 24) (citing '786 Patent at col. 2, ll. 33–35). Plaintiff argues other portions of the specification describe a "continuously transmitted" device presence signal as an exemplary embodiment. (Dkt. No. 98 at 24). According to Plaintiff, nothing in the patent indicates a clear intent by the patentee to limit the device presence signal to a continuous signal. (*Id.*).

Defendants respond that the use of the term "device presence signal" in the claims of the '786 and '342 Patents is nearly identical. (Dkt. No. 101 at 19). Defendants argue that the New Jersey court recognized that a "continuous" signal was essential to the invention disclosed and claimed in the '786 Patent. (*Id.*). Defendants contend the patent explains that when the "interface" connects to the car stereo, it "generates a signal that is sent to the car stereo to keep same in an operational state and responsive to external data and signals" from the after-market audio device. (*Id.*) (citing '786 Patent at col. 2, ll. 29–35). Defendants argue this signal is generated to "indicat[e] that a CD player/changer is present, and the signal is continuously transmitted to the car stereo." (Dkt. No. 101 at 19) (citing '786 patent at col. 12, ll. 29–32). Defendants contend this signal "prevents the car stereo from shutting off, entering into a sleep mode, or otherwise being unresponsive to signals and/or data from an external source." (Dkt. No. 101 at 20) (citing '786 Patent at col. 12, ll. 32–35).

Defendants argue when a patent specification repeatedly and consistently describes the invention in a certain context, the claims should be construed in that context. (Dkt. No. 101 at 20) (citing *Eon-Net LP v. Flagstar Bancorp.*, 653 F.3d 1314, 1321-23 (Fed. Cir. 2011)). Defendants contend the '786 Patent consistently describes the CD player presence signal as

"continuously" transmitted. (Dkt. No. 101 at 20). Defendants argue the '786 Patent does not describe a non-continuous signal. (*Id.*) Defendants also argue the '342 Patent does not change the *Ford* court's analysis. (*Id.*). Defendants contend the '342 Patent added new matter to the '786 Patent, but the new matter also requires a continuous signal. (*Id.*) (citing '342 Patent at col. 29, ll. 16–21).

Plaintiff replies there is nothing unclear about the term "device presence signal" to a person of ordinary skill in the art. (Dkt. No. 106 at 11). According to Plaintiff, the term should be construed according to its plain and ordinary meaning. (*Id.*).

For the following reasons, the Court finds that the term **"device presence signal"** should be construed to mean **"a continuously transmitted signal indicating an audio device is present."**

### b) Analysis

The term "device presence signal" appears in claims 6 and 57 of the '786 Patent, and claim 56 of the '342 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The specification explains that when the "interface" of the '786 Patent connects to the car stereo, it "generates a signal that is sent to the car stereo to keep same in an operational state and responsive to external data and signals" from the after-market audio device. '786 Patent at col. 2, ll. 29–35. The specification further states that this signal is generated to "indicat[e] that a CD player/changer is present, and the signal is *continuously transmitted* to the car stereo." *Id.* at col. 12, ll. 29–32 (emphasis added). The specification emphasizes that continuously transmitting the signal is important because it "prevents the car stereo from shutting off, entering into a sleep mode, or otherwise being unresponsive to signals and/or data from an external source." *Id.* at col. 12, ll. 32–35.

When a patent specification repeatedly and consistently describes the invention in a certain context, the claims should be construed in that context. *Eon-Net LP v. Flagstar Bancorp.*, 653 F.3d 1314, 1321-23 (Fed. Cir. 2011) ("[T]he specification unequivocally compels the constructions adopted by the district court."). The '786 Patent consistently describes the device presence signal as being "continuously transmitted." *See, e.g.*, '786 Patent at col. 12, ll. 29–32 ("Beginning in step 110, a signal is generated by the present invention indicating that a CD player/changer is present, and the signal is continuously transmitted to the car stereo."), col. 13, ll. 15–18 ("Beginning in step 140, the CD player presence signal, described earlier, is generated by the present invention and continuously transmitted to the car stereo."), col. 13, ll. 62–65 ("Beginning in step 170, the CD player presence signal, described earlier, is generated by the present invention and continuously transmitted to the car stereo."), col. 14, ll. 48–51 ("Beginning in step 200, the CD player presence signal, described earlier, is generated by the present invention and continuously transmitted to the car stereo."), col. 15, ll. 35–38 ("If a positive determination is made in step 226, then step 228 is invoked, wherein the CD player presence signal, described earlier, is generated by the present invention and continuously transmitted to the car stereo."), col. 16, ll. 12–15 ("If a positive determination is made in step 246, then step 248 is invoked, wherein the CD player presence signal, described earlier, is generated by the present invention and, continuously transmitted to the car stereo."), col. 16, ll. 57–60 ("If a positive determination is made in step 266, then step 268 is invoked, wherein the CD player presence signal, described earlier, is generated by the present invention and continuously transmitted to the car stereo."), Figures 4A-4G (CD player presence signal is "continuously" transmitted)). Thus, a person of ordinary skill in the art would understand that the device presence signal is a signal that is continuously transmitted in the "present invention."

A review of the '342 Patent does not change that analysis. The '342 Patent added new matter to the '786 Patent, but the new matter also requires a continuously transmitted signal. '342 Patent at col. 29, ll. 16–21 ("Beginning in step 654, a signal is generated by the present invention indicating that a cellular telephone is present, and the signal is continuously transmitted to the car stereo."), FIG. 11B, FIG. 12B ("continuously transmit device presence signal"). And like the '786 Patent, the '342 emphasizes that a continuously transmitted signal is important because it "prevents the car stereo from shutting off, entering into a sleep mode, or otherwise being unresponsive to signals and/or data from an external source." '342 Patent at col. 29, ll. 19–21.

During the claim construction hearing, Plaintiff argued that the "Time Out" step in Figure 5 indicates the device presence signal does not have to be "continuously transmitted." To be clear, Figure 5 is a flowchart illustrating processing logic that allows a user to switch between an after-market audio device and one or more auxiliary input sources. '786 Patent at col. 19, ll. 3–5. The "Time Out" is not related to the recited "device presence signal." Instead, the "Time Out" in Figure 5 relates to determining whether a predetermined period of time has expired before switching to another input source. '786 Patent at col. 19, ll. 35–48. This is not the same as a "continuously transmitted signal" that maintains "the car stereo in a state responsive to processed data and audio signals." '786 Patent at Claim 6. Indeed, the specification states that "[i]n step 316 [of Figure 5], the logic of block 198 of FIG. 4d (the auxiliary input handling process), discussed earlier, is invoked, so that the user can select from one of the auxiliary input sources in accordance with the present invention." *Id.* at col. 19, ll. 48–52. As discussed above, step 200 of Figure 4d requires "continuously transmit CD player presence signal." *Id.* at col. 14, ll. 48–51 ("Beginning in step 200, the CD player presence signal, described earlier, is generated by the

present invention and continuously transmitted to the car stereo."). As recited in claim 6 of the '786 Patent, the device presence signal is "for maintaining the car stereo in a state responsive to processed data and audio signals."

As a final matter, the Court specifically notes why it rejected the "continuous signal" part of Defendants' proposed construction. The Court reads a "continuous" signal to mean a signal that has no interruptions. The Court finds a "continuously transmitted" signal to mean any signal that a person of ordinary skill in the art would find to be "continuously transmitted" even if the transmission is interrupted at times. For example, a heartbeat produces a pulse that is not a "continuous" signal because the signal is interrupted when the heart contracts. However, a heartbeat produces a pulse that is a "continuously transmitted" signal because the pulse is "continuously transmitted" at rhythmic or arrhythmic intervals. In sum, the Court does not find the signal must be "continuous" because the specification only says the "device presence signal" must be "continuously transmitted."

### c) Court's Construction

The Court construes the term **"device presence signal"** to mean **"a continuously transmitted signal indicating an audio device is present."**

### 5. "maintaining . . . in a state responsive" / "maintain . . . in a state responsive"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "maintaining . . . in a state responsive" / "maintain . . . in a state responsive" | Plain meaning | "preventing the car stereo from shutting off, entering a sleep mode, or otherwise being unresponsive to signals and/or data from an external source" |

### a) The Parties' Positions

The parties dispute whether "maintain/maintaining . . . in a state responsive" should be

construed to mean "preventing the car stereo from shutting off, entering a sleep mode, or otherwise being unresponsive to signals and/or data from an external source," as Defendants propose. Plaintiff contends the meaning of these phrases is clear to a person of ordinary skill in the art in view of the claims and specification of the '786 Patent. (Dkt. No. 98 at 30) (citing '786 Patent at col. 22, ll. 13–15, '342 Patent at col. 43, ll. 7–9). Plaintiff argues that the specification states, "Importantly, this signal prevents the car stereo from shutting off, entering a sleep mode, or otherwise being unresponsive to signals and/or date from an external source." (Dkt. No. 98 at 30) (citing '786 Patent, col. 12, ll. 32–35). According to Plaintiff, Defendants' construction is improper because it impermissibly reads limitations from the specification into the claims. (Dkt. No. 98 at 30).

Defendants respond that their construction comes directly from the specifications' explanation of what it means to maintain a car stereo or car audio/video system in a responsive state. (Dkt. No. 101 at 38). Defendants argue both patents make clear that the car stereo or car audio/video system must be responsive to "signals and/or data," and that such signals and/or data are from an "external source." (*Id.*) Defendants contend both patents repeatedly state the device presence signal "prevents the car stereo from shutting off, entering a sleep mode, or otherwise being unresponsive to signals and/or data from an external source." (*Id.*) (citing '786 Patent at col. 12, ll. 32–35; '342 Patent at col. 16, ll. 58–62, col. 17, ll. 52–54, col. 18, ll. 35–38, col. 19, ll. 23–26, col. 21, ll. 42–45). According to Defendants, their construction reflects this critical aspect of the alleged invention. (Dkt. No. 101 at 38).

Plaintiff replies that Defendants again seek to improperly import limitations from the written description into the claims. (Dkt. No. 106 at 18). Plaintiff contends when the appropriate effort is made to discern the ordinary and customary meanings attributed to the words of the

claims themselves, it is clear that these terms do not require construction. (*Id.*).

For the following reasons, the Court finds the phrases **"maintaining . . . in a state responsive"** and **"maintain . . . in a state responsive"** should be construed to mean **"preventing the car stereo from shutting off, entering a sleep mode, or otherwise being unresponsive to signals and/or data from an external source."**

### b) Analysis

The phrase "maintaining . . . in a state responsive" appears in claim 6 of the '786 Patent. The phrase ""maintain . . . in a state responsive" appears in claim 56 of the '342 Patent. Both the '786 Patent and the '342 Patent state the car stereo or car audio/video system must be responsive to "signals and/or data" and that such signals and/or data are from an "external source." '786 Patent at col. 12, ll. 32–35; '342 Patent at col. 16, ll. 58–61. Furthermore, both patents emphasize that a continuously transmitted signal is important because it "prevents the car stereo from shutting off, entering into a sleep mode, or otherwise being unresponsive to signals and/or data from an external source." '786 Patent at col. 12, ll. 32–35 ("Importantly, this signal prevents the car stereo from shutting off, entering a sleep mode, or otherwise being unresponsive to signals and/or data from an external source"), '342 at col. 29, ll. 19-21 ("Importantly, this signal prevents the car stereo from shutting off, entering a sleep mode, or otherwise being unresponsive to signals and/or data from an external source.").

Accordingly, the Court finds this important aspect of the disclosure should be included the claims. *Microsoft Corp. v. Multi-Tech. Sys., Inc.*, 357 F.3d 1340, 1348 (Fed. Cir. 2004) (finding that statements in the common specification limits the claim language because they "are not limited to describing a preferred embodiment, but more broadly describe the overall inventions of all three patents"); *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1370 (Fed.

Cir. 2003) ("This court looks to whether the specification refers to a limitation only as a part of less than all possible embodiments or whether the specification read as a whole suggests that the very character of the invention requires the limitation be a part of every embodiment.").

### c) Court's Construction

The Court construes the phrases **"maintaining . . . in a state responsive"** and **"maintain . . . in a state responsive"** to mean **"preventing the car stereo from shutting off, entering a sleep mode, or otherwise being unresponsive to signals and/or data from an external source."**

### 6. "external"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "external" | "a device that is outside and alien to the environment of an OEM or after-market stereo system but for the inclusion of an interface" | "an after-market device outside and alien to the environment of an OEM or after-market stereo system" |

### a) The Parties' Positions

The parties dispute whether the construction of the term "external" should include the phrase "but for the inclusion of an interface," as Plaintiff proposes. Plaintiff argues that in defining the term "inter-operable," the '786 Patent provides context to the claim term "external." (Dkt. No. 98 at 19) (citing '786 Patent at col. 4, ll. 59–67). According to Plaintiff, the '786 Patent makes clear that an "external" device is only alien to the environment of an OEM or after-market stereo system but for the inclusion of the interface of the present invention. (Dkt. No. 98 at 19). Plaintiff contends that Defendants' construction is an attempt to broaden the scope of a claim term that has been clearly defined by the patentee. (*Id.*).

Defendants respond that Plaintiff's construction vitiates the "outside and alien" part of its construction by injecting the phrase "but for the inclusion of an interface." (Dkt. No. 101 at 18).

Defendants argue that Plaintiff's construction contradicts the specification, the inventive concept of the patents, and the prior testimony of MPH's expert during the claim construction hearing in the *Ford* Case. (*Id.*). Defendants contend the claims recite an after-market device "external to the [car stereo]." (*Id.*) (citing '786 Patent at Claims 1, 57; '342 Patent at Claims 49, 73). Defendants argue the New Jersey court noted that "the inventive concept . . . relates to an audio device integration system, wherein [these external] after-market audio devices . . . can be integrated with . . . car stereo systems." (Dkt. No. 101 at 18) (citing Dkt. No. 101-4 at 24). According to Defendants, this integration allows "a device that is alien to the environment of an existing OEM or after-market car stereo to be utilized thereby." (Dkt. No. 101 at 18) (citing Dkt. No. 101-4 at 24).

Defendants further argue MPH's expert in the *Ford* case also characterized the claimed after-market devices as alien to the car stereo, rather than devices "designed for a car application" (Dkt. No. 101 at 18) (citing Dkt. No. 101-15 at col. 42, ll. 7-23; col. 42, ll. 4-5 (defining 'alien' as "something that didn't belong in the car originally.")). Defendants also argue that MPH made a similar argument in the *Ford* case. (Dkt. No. 101 at 19) (citing Dkt. No. 101-10 at col. 31, l. 19–col. 32, l. 20). Defendants contend Plaintiff's reliance on the concept of "interoperability" confuses the interface with the external audio device. (Dkt. No. 101 at 19). Defendants argue the car stereo, external device, and interface are each separate components of the claimed invention. (*Id.*) ('786 Patent at col. 2, ll. 22–35, Figures 1 and 2). According to Defendants, interoperability is achieved by the interface. (Dkt. No. 101 at 19).

Plaintiff replies its construction seeks to clarify the *Ford* construction so that the claims in which the term "external" is recited are afforded their proper scope. (Dkt. No. 106 at 10) (citing Dkt. 98-1 at 24). Plaintiff argues the New Jersey court acknowledged that an "external"

device is only alien to the environment of an OEM or after-market stereo system but for the inclusion of the interface of the present invention. (Dkt. No. 196 at 10). According to Plaintiff, it seeks to make this distinction clear and avoid confusion by the jury as to what is covered by the '786 Patent. (*Id.*).

For the following reasons, the Court finds that the term **"external"** should be construed to mean **"outside and alien to the environment of an OEM or after-market stereo system."**

### b) Analysis

The term "external" appears in claims 1 and 57 of the '786 Patent, and claims 49 and 73 of the '342 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The Court generally agrees with the construction and analysis provided in the *Ford* case. However, the Court finds that including "an aftermarket device" in the construction is unnecessary. As the court stated in the *Ford* case, "the inventive concept of '786 Patent relates to an audio device integration system, wherein one or more after-market audio devices such as CD player, CD changer, MP3 player, etc., can be integrated with factory-installed or after-market car stereo systems." (Dkt. No. 101-4 at 24) (citing '786 Patent at col. 1, ll. 5–12, col. 4, ll. 26–32). The specification states "allowing a device that is alien to the environment of an existing OEM or after-market car stereo to be utilized thereby." '786 Patent at col. 4, ll. 66–67.

The Court agrees with Defendants that Plaintiff's reliance on the concept of "interoperability" confuses the interface with the external audio device. The specification and figures indicate that the car stereo, external device, and interface are each separate components of the claimed invention. *See*, *e.g.*, '786 Patent at col. 2, ll. 22–35, Figures 1 and 2. The interoperability is achieved by the interface and by not the car radio or external device. In other

words, if the radio and external device were interoperable, then there would be no need for the claimed interface. Plaintiff's proposed "but for the inclusion of an interface" language could vitiate the "outside and alien" part of the external device. At the very minimum, Plaintiff's proposal is confusing and unnecessary, and is therefore rejected by the Court. Finally, in reaching its conclusion, the Court has considered the extrinsic evidence submitted by the parties, and given it its proper weight in light of the intrinsic evidence.

### c) Court's Construction

The Court construes the term **"external"** to mean **"outside and alien to the environment of an OEM or after-market stereo system."**

### 7. "portable"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
| --- | --- | --- |
| "portable" | Plain Meaning | "capable of being moved about" |

### a) The Parties' Positions

The parties dispute whether the term "portable" requires construction. Plaintiff argues that one of ordinary skill in the art could readily understand the plain meaning of the term "portable," and further construction is not necessary. (Dkt. No. 98 at 26). Plaintiff contends the claims themselves impart sufficient meaning because they refer to a "portable device" and a "portable MP3 player," and do not use the term "portable" in isolation. (*Id.*) Plaintiff further contends the specification gives examples of a "portable device" that sufficiently define the term "portable" in the context of the patents. (*Id.*) (citing '342 Patent at col. 5, ll. 10–14).

Plaintiff also argues Defendants' construction of "portable" as "capable of being moved about" improperly broadens the plain meaning of the term to include anything which can be moved, no matter how large or unwieldy. (Dkt. No. 98 at 26). Plaintiff argues there are many

components of a vehicle that one of ordinary skill in the art understands are not "portable," but which would be considered "portable" under Defendants' construction. (*Id.*) According to Plaintiff, Defendants' construction renders the word "portable" meaningless by rendering literally any object portable. (*Id.*)

Defendants argue that the *Ford* court correctly construed "portable" as "capable of being moved about." (Dkt. No. 101 at 20). Regarding Plaintiff's argument that the *Ford* construction might be read too broadly, Defendants contend the New Jersey court noted that the scope of the invention is confined to aftermarket audio devices. (*Id.*) (citing Dkt. No. 101-4 at 26). Defendants argue the term "portable" is only used in the claims for integrating audio devices with the car radio. (Dkt. No. 101 at 20) (citing '786 Patent at Claims 44, 57, 92; '342 Patent at Claims 1, 25, 49, 73, 97, 120, 121).

Plaintiff replies "portable" is another term that does not require construction. (Dkt. No. 106 at 11). Plaintiff contends Defendants are seeking to construe "portable" as "capable of being moved about" to broaden the scope of the claims of the Asserted Patents to cover virtually any item. (*Id.*)

For the following reasons, the Court finds that the term **"portable"** should be construed to mean **"capable of being moved about."**

### b) Analysis

The term "portable" appears in claim 57 of the '786 Patent, and claims 49, 53, 54, 56, 57, 62, 70, 73, 77, and 78 of the '342 Patent. The Court finds the term is used consistently in the claims and is intended to have the same general meaning in each claim. The Court agrees with the construction and analysis provided in the *Ford* case. Specifically, in construing the term "portable" to mean "capable of being moved about," the New Jersey court stated the following:

The only reference in the specification of '786 Patent to "portable" is noted in col. 20, ll. 64-67 to col. 21, ll. 1-20, with respect to Figures 7A-7B. Other references to "portable" are found in the claims, inter alia: portable CD player, portable MP3 player, portable satellite receiver, portable Digital Audio Broadcast (DAB) receiver. (See '786 Patent, claims 93, 94, 95 and 96.) Thus, keeping in mind that the inventive concept of present invention is to integrate an aftermarket audio device with factory-installed or after-market car stereo systems, and in light of the specification, it would be understood that the portable after-market device is capable of being moved about.

(Dkt. No. 101-4 at 26). During the claim construction hearing, Plaintiff argued that the devices that are relevant to the claims can be carried by a person. This is consistent with the court's analysis in the *Ford* case. Accordingly, the Court rejects any argument that the scope of the claims may include anything which can be moved, no matter how large or unwieldy. The context and scope of the claims is related to devices that can be carried by a person.

### c) Court's Construction

The Court construes the term **"portable"** to mean **"capable of being moved about."**

### 8. "pre-programmed"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "pre-programmed" | Plain Meaning or "programmed prior to its use" | "programmed prior to its use in the normal course" |

### a) The Parties' Positions

The parties dispute whether the term "pre-programmed" requires construction. Plaintiff argues the word "preprogrammed" is unambiguous to person of ordinary skill in the art and does not require construction. (Dkt. No 98 at 25). Plaintiff contends that Defendants have injected the vague term "in the normal course" into their construction without intrinsic support. (*Id.*). In the alternative, Plaintiff argues a construction of "programmed prior to its use" is consistent with the term's use in the claims and specification of the '786 Patent. (*Id.*).

Defendants respond the New Jersey court correctly construed the term "pre-programmed"

as "programmed prior to its use in the normal course." (Dkt. No. 101 at 21) (citing Dkt. No. 101-4 at 23). Defendants argue in the *Ford* case, MPH proposed "programmed prior to its use by the consumer in the normal course." (Dkt. No. 101 at 21). Defendants contend the court adopted most of MPH's proposal, and found the '786 Patent discloses pre-programming the aftermarket audio device such that a consumer who is not technologically savvy would be able to use it "as is." (*Id.*). Defendants argue Plaintiff's only basis for abandoning the prior construction is unsupported attorney argument that the phrase is vague and improperly "manufactur[es] a noninfringement argument." (*Id.*). Defendants contend this Court should adopt the *Ford* construction. (*Id.*).

Plaintiff replies Defendants' construction is an attempt to avoid infringement liability for systems in which code is installed after the car stereo has been used. (Dkt. No. 106 at 11). Plaintiff argues the words "in the normal course" do not appear in the specifications of the Asserted Patents or in their file histories, and Defendants' construction only serves to add confusion as to when something is "in the normal course." (*Id.*). Plaintiff contends the term "pre-programmed" should be given its plain and ordinary meaning. (*Id.*).

For the following reasons, the Court finds the term **"pre-programmed"** should be given its plain and ordinary meaning.

### b) Analysis

The term "pre-programmed" appears in claims 1, 7, 8, 57, and 60 of the '786 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The Court notes that the term "pre-programmed" appears only in the claims of the '786 Patent. In the context of the intrinsic evidence, the Court finds that the term does not require construction because it is unambiguous, is easily understandable by a

jury, and should be given its plain and ordinary meaning.

For example, claim 1 says the interface includes a "microcontroller pre-programmed to execute: a first pre-programmed code portion for remotely controlling the after-market audio device using the car stereo . . . a second pre-programmed code portion for receiving data from the after-market audio device through said second connector in a format incompatible with the car stereo . . . and a third pre-programmed code portion for switching to one or more auxiliary input sources connected to said third electrical connector."

Defendants argue because MPH originally asked the New Jersey court to include the phrase "in the normal course," the Court should adopt the *Ford* construction. (Dkt. No. 101 at 21). The phrase "in the normal course" was not the issue in the *Ford* case. Instead, the issue was whether the term should be construed as "pre-programmed during manufacture" or "by a consumer." (Dkt. No. 101-4 at 23). The New Jersey court found that "limiting the definition of pre-programmed to 'by a consumer' or 'during manufacture' would be inappropriate in light of the teachings in the specification, and custom and usage of such microcontrollers by a person of ordinary skill in this field of technology." (Dkt. No. 101-4 at 24). The Court agrees and finds that the term should be given its plain and ordinary meaning. The words "in the normal course" do not appear in the specifications of the Asserted Patents or their file histories. Defendants' construction only adds confusion as to when something is "in the normal course."

### c) Court's Construction

The term **"pre-programmed"** will be given its plain and ordinary meaning.

### 9. "car stereo" / "car audio/video system"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "car stereo" | Plain Meaning<br><br>Or if the Court believes that this term requires construction, then: "components that process audio signals and produce audible output in a car" | "car stereo" is "All presently existing car stereos and radios, such as physical devices that are present at any location to software within a vehicle, in addition to software and/or graphically-or display-driven receivers. An example of such a receiver is a software-driven receiver that operates on a universal LCD panel within a vehicle and is operable by a user via a graphical user interface displayed on the universal LCD panel. Further, any future receiver, whether a hardwired or a software/graphical receiver operable on one or more displays, is considered within the definition of the terms 'car stereo' and 'car radio.'" |
| "car audio/video system" | Plain Meaning | "car audio/video system" is "All presently existing car audio and video systems, such as physical devices that are present at any location within a vehicle, in addition to software and/or graphically-or display- driven receivers. An example of such a receiver is a software-driven receiver that operates on a universal LCD panel within a vehicle and is operable by a user via a graphical user interface displayed on the universal LCD panel. Further, any future receiver, whether a hardwired or a software/graphical receiver operable on one or more displays, is considered within the definition of the terms 'car audio/video systems.'" |

### a) The Parties' Positions

The parties dispute whether the terms "car stereo" and "car audio/video system" require construction. Plaintiff argues that a person of ordinary skill in the art would have reasonable certainty about the scope of the term "car stereo." (Dkt. No. 98 at 27). In the alternative, Plaintiff argues "car stereo" should be construed to mean "components that process audio signals and produce audible output in a car." (*Id.*). Plaintiff contends Defendants' construction lifts a portion of the specification that describes examples of what was meant by the patentee as a "car stereo" or "car radio" and elevates them to the status of a definition. (*Id.*). Plaintiff argues that the specification actually states that "[a]lso as used herein, the terms 'car stereo' and 'car radio' are used interchangeably, and are intended to include all presently existing car stereos . . . ." (*Id.*)

(citing '786 Patent at col. 5, ll. 1–3). Plaintiff further contends that this is not an instance where the patentee acted as his own lexicographer, but instead indicated that "car stereo" should be interpreted broadly. (Dkt. No. 98 at 27).

Regarding the term "car audio/video system," Plaintiff argues Defendants used the portion of the specification intended to provide examples of a "car stereo" and "car radio," but then changed the language in several places to refer to "car audio and video systems." (*Id.* at 28). Plaintiff contends this alteration of the specification to construe a term should be rejected. (*Id.*).

Defendants respond that MPH and Ford agreed on a construction in the *Ford* case, which is the same construction Defendants are proposing in this case. (Dkt. No. 101 at 22). Defendants argue MPH's attorney clarified the broad scope of "all presently existing car stereos" as used in the construction. (*Id.*) (citing Dkt. No. 101-15 at 6-7). Defendants contend that when a patentee provides an explicit definition of a term, that definition controls. (Dkt. No 101 at 22). Defendants further argue their proposed construction reflects the broad definition in the specification and is consistent with the patentee's express identification of what is included in the term "car stereo." (*Id.* at 23). Defendants contend the New Jersey court reached the same conclusion. (*Id.*) (citing Dkt. No. 101-4 at 6).

Defendants further argue the "car audio/video system" of the '342 Patent is analogous to the "car stereo" of the '786 Patent and should therefore be similarly construed. (Dkt. No. 101 at 23). Defendants contend where the '786 Patent describes an "audio device integration system," a "car stereo," and a "car radio," the '342 Patent describes a "multimedia device integration system," and a "car stereo or video system." (*Id.*) (citing '786 Patent at col. 4, ll. 27–46; '342 Patent at col. 8, ll. 38–63). Defendants also argue the '342 Patent includes Figures 18 through 24, with the associated description describing a "car audio and/or video system" and a "portable

audio and/or video device." (Dkt. No. 101 at 23) (citing '342 Patent at col. 33, l. 43–col. 38, l. 67). Defendants contend the "car audio and/or video system" described by the '342 Patent is described in the same way as the "car stereo" of the '786 Patent, except that the "audio" and "video" elements are directly expressed. (Dkt. No. 101 at 23).

Plaintiff replies collateral estoppel does not apply with respect to the terms "car stereo" and "car audio/video system," because the construction of these terms was not "actually litigated." (Dkt. No. 106 at 11). Plaintiff contends the parties to the *Ford* case agreed upon the construction of the term "car stereo," and "[Defendants have] not identified any legal doctrines that would compel [this Court] to adopt the stipulated construction." (*Id.* at 12).

Plaintiff further contends there is no reason to inject statements from the specifications into the construction of these terms. (*Id.*). Plaintiff argues the patentee did not act as its own lexicographer with respect to these terms. (*Id.*) Plaintiff contends the patentee provided a description of the terms "car stereo" and "car audio/video" system in the specifications, but did not redefine them. (*Id.*)

For the following reasons, the Court finds the term **"car stereo"** should be construed to mean **"All presently existing car stereos and radios, such as physical devices that are present at any location within a vehicle, in addition to software and/or graphically-or display-driven receivers. An example of such a receiver is a software-driven receiver that operates on a universal LCD panel within a vehicle and is operable by a user via a graphical user interface displayed on the universal LCD panel. Further, any future receiver, whether a hardwired or a software/graphical receiver operable on one or more displays, is considered within the definition of the terms 'car stereo' and 'car radio.'"** The Court further finds the term **"car audio/video system"** should be given its plain and ordinary

meaning.

### b) Analysis

The term "car stereo" appears in claims 1, 6, 14, 57, and 60 of the '786 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The term "car audio/video system" appears in claims 49, 53, 54, 56, 70, 73, 77, and 78 of the '786 Patent. The Court finds the term is used consistently in the claims and is intended to have the same general meaning in each claim.

Regarding the term "car stereo," the Court finds the patentee acted as its own lexicographer and explicitly defined the term. The '786 Patent defines "car stereo" as follows:

> Also, as used herein, the terms "car stereo" and "car radio" are used interchangeably and are intended to include all presently existing car stereos and radios, such as physical devices that are present at any location within a vehicle, in addition to software and/or graphically-or display-driven receivers. An example of such a receiver is a software-driven receiver that operates on a universal LCD panel within a vehicle and is operable by a user via a graphical user interface displayed on the universal LCD panel. Further, any future receiver, whether a hardwired or a software/graphical receiver operable on one or more displays, is considered within the definition of the terms "car stereo" and "car radio," as used herein, and is within the spirit and scope of the present invention.

'786 Patent at col. 5, ll. 1–14. The New Jersey court reached the same conclusion. (Dkt. No. 101-4 at 6). Accordingly, the Court adopts the definition provided by the patentee. *Phillips*, 415 F.3d at 1316 ("[O]ur cases recognize that the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs.").

During the claim construction hearing, Plaintiff stated that it was concerned about limiting the scope of the claims to "presently existing car stereos and radios" at the time of the invention. Plaintiff's concern fails to consider the entire definition because the specification states that "any future receiver, whether a hardwired or a software/graphical receiver operable on

one or more displays, is considered within the definition of the terms 'car stereo' and 'car radio.'" Therefore, to the extent that a party argues the scope of the claims is limited to only "presently existing car stereos and radios" at the time of the invention, the Court rejects this argument.

Regarding the term "car audio/video system," the Court finds the term is unambiguous, is easily understandable by a jury, and should be given its plain and ordinary meaning. Defendants argue the "car audio/video system" of the '342 Patent is analogous to the "car stereo" of the '786 Patent, and should therefore be similarly construed. (Dkt. No. 101 at 23). However, unlike the term "car stereo," the specification does not provide a definition of "car audio/video system." Thus, there is less reason to construe the term as Defendants propose. In addition, the term was not at issue in the *Ford* case so the parties did not agree to a construction for this term. Most importantly, the construction proposed by Defendants does not provide any further clarity to the disputed term "car audio/video system." Indeed, defining "car audio/video" as "all presently existing car audio and video systems" is not helpful to the jury.

### c) Court's Construction

The Court construes the term **"car stereo"** should be construed to mean **"All presently existing car stereos and radios, such as physical devices that are present at any location within a vehicle, in addition to software and/or graphically-or display-driven receivers. An example of such a receiver is a software-driven receiver that operates on a universal LCD panel within a vehicle and is operable by a user via a graphical user interface displayed on the universal LCD panel. Further, any future receiver, whether a hardwired or a software/graphical receiver operable on one or more displays, is considered within the definition of the terms 'car stereo' and 'car radio.'"** The term **"car audio/video system"** will

be given its plain and ordinary meaning.

**10. "format incompatible with the [after-market audio device, MP3 player, portable device]" / "format incompatible with the [car stereo / car audio/video system]"**

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "format incompatible with the [after-market audio device, MP3 player, portable device]"<br><br>"format incompatible with the [car stereo / car audio/video system]" | Plain Meaning. | Hyundai, Kia, Nissan, Toyota, and Volkswagen's Proposed Construction:<br>"a format that the OEM or factory-installed car stereo was not designed to use when communicating with an aftermarket device"<br><br>Honda's Proposed Construction:<br>"format alien to and inoperable with the [after-market audio device, MP3 player, portable device]"<br>"format alien to and inoperable with an existing [car stereo, car audio/video system]" |

    a) **The Parties' Positions**

The parties dispute whether the phrases "format incompatible with the [after-market audio device, MP3 player, portable device]" and "format incompatible with the [car stereo / car audio/video system]" require construction. Plaintiff argues there is nothing unclear about the meaning of the phrases to a person of ordinary skill in the art or even to a layperson. (Dkt. No. 98 at 23-24). Plaintiff contends "incompatible" is well-known to mean "not designed to work with another device or system without modification." (Dkt. No. 98 at 23) (citing Dkt. No. 88-1 at 3). Plaintiff argues Defendants cannot agree on a construction and each construction inserts concepts such as "OEM for factory-installed car stereo" and "alien and inoperable" that are irrelevant to the claim term. (Dkt. No. 98 at 23).

Defendants argue their constructions exclude the existing car audio systems and external

media devices from being designed to communicate with each other. (Dkt. No. 101 at 31) (citing '786 Patent at col. 1, ll. 60–64). Defendants contend that the patentee repeatedly emphasized this aspect of his invention during prosecution to overcome several prior art rejections. (Dkt. No. 101 at 31) (citing Dkt. No. 101-12 at 5, Dkt. No. 101-13 at 2-3, 6-8, Dkt. No. 101-18 at 9, Dkt. No. 101-19 at 9). Defendants also argue that the patentee testified along these lines in the *Dice* case. (Dkt. No. 101 at 31-32) (citing Dkt. No. 101-3 at 261-62).

Plaintiff replies Defendants' constructions for these terms are unnecessary and confusing. (Dkt. No. 106 at 15). Plaintiff contends this is highlighted by the fact that Defendants themselves cannot agree on a single construction. (*Id.*)

For the following reasons, the Court finds that the phrases **"format incompatible with the [after-market audio device, MP3 player, portable device]"** and **"format incompatible with the [car stereo / car audio/video system]"** should be given their plain and ordinary meaning.

### b) Analysis

The phrase "format incompatible with the [after-market audio device, MP3 player, portable device]" appears in claims 1 and 57 of the '786 Patent, and claims 53 and 77 of the '342 Patent. The phrase "format incompatible with the [car stereo / car audio/video system]" appears in claims 54, 70, and 78 of the '342 Patent. The Court finds that the phrases are used consistently in the claims and are intended to have the same general meaning in each claim. The Court further finds that the phrases are unambiguous, are easily understandable by a jury, and should be given their plain and ordinary meaning.

The first group of Defendants propose changing the words "format incompatible with" to "a format that the OEM or factory-installed car stereo was not designed to use when

communicating." Similarly, Defendant Honda proposes changing the words "format incompatible with" to "format alien to and inoperable with." Both of Defendants' constructions do not clarify the disputed phrases. Indeed, Defendants cannot agree on a single construction, and each construction inserts concepts such as "OEM for factory-installed car stereo" and "alien and inoperable" that are unnecessary.

The Court agrees with Plaintiff that a person of ordinary skill in the art would understand "compatible" to means "designed to work with another device or system without modification." (Dkt. No. 88-1 at 3) (Merriam-Webster's Collegiate Dictionary (10th ed. 1994) (defining "Compatible: 5: designed to work with another device or system without modification; esp: being a computer designed to operate in the same manner and use the same software as another computer.")). Thus, a person of ordinary skill would understand that "incompatible" means "not designed to work with another device or system." The remainder of this claim phrase does not require further explanation or clarification.

Defendants argue that the patentee repeatedly emphasized this aspect of his invention during prosecution to overcome several prior art rejections. (Dkt. No. 101 at 31-32.) Unlike the variances in Defendants' constructions, the Court finds that the patentee consistently emphasized that the prior art failed to disclose external devices that are "incompatible" with a car stereo system. Accordingly, the Court adopts the claim language chosen by the patentee instead of redrafting the claims as Defendants propose.

Moreover, during the claim construction hearing, it became clear that Defendants were not really disputing the term "incompatible." Instead, the Defendants saying the term included a time limitation on when in the manufacturing process the compatibility or incompatibility of a device should be assessed. However, the claim recites no specific time limitation on when the

compatibility or incompatibility of a device should be assessed. The claim just requires the "pre-programmed code portion for remotely controlling the after-market audio device using the car stereo by receiving a control command from the car stereo through said first connector in a format incompatible with the after-market audio device." Finally, in reaching its conclusion, the Court has considered the extrinsic evidence submitted by the parties, and given it its proper weight in light of the intrinsic evidence.

### c) Court's Construction

The phrases **"format incompatible with the [after-market audio device, MP3 player, portable device]"** and **"format incompatible with the [car stereo / car audio/video system]"** will be given their plain and ordinary meaning.

### 11. "video information"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
| --- | --- | --- |
| "video information" | Plain meaning | "moving visual images" |

### a) The Parties' Positions

The parties dispute whether the term "video information" should be construed as "moving visual images," as Defendants propose. Plaintiff argues the meaning of this claim term is easily understood by a person of ordinary skill in the art. (Dkt. No. 98 at 28-29) (citing '786 Patent at col. 20, ll. 44–54). Plaintiff further argues nowhere in the '786 Patent is there any indication that video information means "moving visual images." (Dkt. No. 98 at 29). Plaintiff contends Defendants are attempting to obtain a narrow construction in order to exclude information such as album art from the scope of the claims of the '786 Patent. (*Id.*).

Defendants respond the '786 Patent describes several different types of information that can be sent to the car radio. (Dkt. No. 101 at 35) (citing '786 Patent at col. 4, ll. 32–39).

Defendants argue "video information" is just one type of data that can be received and processed by the interface. (Dkt. No. 101 at 35). According to Defendants, other types of information include "graphical" and "menu-based" information. (*Id.*). Defendants contend the '786 Patent likens a "graphical" object to a still image such as an "icon." (*Id.*) (citing '786 Patent at col. 20, l. 2). Defendants contend the separate identification of "video" information and "graphical" information reveals that the two are different. (Dkt. No. 101 at 35). Defendants also contend the patentee confirmed this distinction during prosecution of a child application, where he argued that "video" was generally understood as "pictures/scenes in motion" to overcome prior art. (*Id.* at 36) (101-26 at 3-4).

Plaintiff replies that Defendants' construction is an attempt to avoid infringement liability. (Dkt. No. 106 at 17). Plaintiff argues that Defendants' recitation of the specification is wrong because it describes video information as being "presented as one or more menus, textual, or graphical prompts for display on an LCD display of the radio, allowing interaction with the user at the radio." (*Id.*) (citing '786 Patent at col. 2, ll. 43–50).

For the following reasons, the Court finds that the term **"video information"** should be construed to mean **"visual images."**

### b) Analysis

The term "video information" appears in dependent claim 10 of the '786 Patent. The claims include both "audio signals" and "video information." Claim 1 recites "an interface connected between said first and second electrical connectors for channeling audio signals to the car stereo from the after-market audio device." Dependent claim 10 adds "wherein said interface processes video information generated by the after-market audio device." Given this context, the Court finds the patentee's argument during the prosecution of a child application distinguished

the prior art because it disclosed "textural information." (Dkt. No. 101-26 at 4). Specifically, the prior art disclosed caller identification information. (*Id.*). In other words, the patentee did not distinguish the prior art because it disclosed static visual images. Instead, the patentee distinguished the prior art because it disclosed only textural information. This is not a clear and unambiguous disavowal of static visual images. Accordingly, a person of ordinary skill in the art would understand that "video information" includes both static and moving visual images.

Defendants contend the separate identification of "video" information and "graphical" information reveals that the two are different. (Dkt. No. 101 at 35). The Court disagrees. The specification does state that "[t]he information channeled to the car radio can include video from the external device, as well as graphical and menu-based information." '786 Patent at col. 12, ll. 37–39. However, this portion of the specification does not define "video information" in way that clearly and unambiguously excludes static visual images. Instead, it provides an example of a static visual image (*i.e.*, graphical information). Accordingly, the Court rejects Defendants' construction because it requires "moving" visual images.

### c) Court's Construction

The Court construes the term **"video information"** to mean **"visual images."**

### 12. "connector electrically connectable to" / "electrical connector" / "connectable"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "connector electrically connectable to" / "electrical connector" / "connectable" | Plain meaning | "connector capable of being physically and electrically connected and disconnected" For connectable: "able to be disconnected and connected" |

### a) The Parties' Positions

The parties dispute whether "connector" should be construed to require a physical

connector, which is capable of being connected and disconnected. Plaintiff argues the meaning of these terms is clear to a person of ordinary skill in the art. (Dkt. No. 98 at 29). Plaintiff contends Defendants' constructions create more ambiguity than clarity. (*Id.*). Plaintiff argues that Defendants' construction of an "electrical connector" is circular because it defines a "connector" as a "connector capable of being . . . connected." (*Id.*). According to Plaintiff, this defines a connector in terms of itself and fails to inform the jury of the nature of a connector. (*Id.* at 29-30).

Defendants respond that connecting the interface to the car stereo or the external device via Bluetooth or other wireless connection was never contemplated in the '786 Patent. (Dkt. No. 101 at 36). Defendants argue Plaintiff's own dictionary definition of "connector" requires a "detachable device for connecting electrical conductors." (*Id.*) (citing Dkt. No. 88-1 at 10). Defendants further argue during prosecution, Mr. Marlowe tried to distinguish a prior art reference that "only discloses customized, detachable units which are connectable at one or more locations in a vehicle . . . ." (Dkt. No. 101 at 36) (citing Dkt. No. 101-27 at 6). According to Defendants, something that can be "connectable" and detachable indicates the proper meaning of "connectable" is "able to be disconnected and connected." (Dkt. No. 101 at 37).

Defendants also argue the '786 Patent makes clear that "electrically connectable" devices are connected not only electrically, but also physically. (Dkt. No. 101 at 37) (citing '786 Patent at col. 8, ll. 31–39, col. 9, ll. 22–44, col. 10, ll. 34–48, col. 11, ll. 19–29, Figures 3A, 3B, 3C, and 3D). According to Defendants, construing the terms to encompass wireless connection would impermissibly broaden the '786 Patent claims. (Dkt. No. 101 at 37). Defendants argue the first disclosure of any wireless embodiment did not appear until December 2003, in a continuation-in-part of the application of the '786 Patent. (*Id.*) (citing Dkt. No. 101-28 at [0107]).

Plaintiff replies it is not attempting to construe the claims of the '786 Patent to cover wireless connections. (Dkt. No. 106 at 17). Plaintiff argues its position is that these terms need not be construed, and that Defendants' constructions are confusing and unhelpful. (*Id.*). Plaintiff further argues Defendants' reliance on the file history of the '786 Patent is misplaced and has no bearing on the construction of "connector." (*Id.*).

For the following reasons, the Court finds that the terms **"connector electrically connectable to," "electrical connector,"** and **"connectable"** should be given their plain and ordinary meaning.

### b) Analysis

The phrase "connector electrically connectable to" appears in claim 1 of the '786 Patent. The terms "electrical connector" and "connectable" appear in claims 1, 5, and 57 of the '786 Patent. The Court finds the terms are used consistently in the claims and have the same general meaning in each claim. As an initial matter, the parties agree the scope of the claims of the '786 Patent do not cover wireless connections. Plaintiff conceded this in its reply brief and during the claim construction hearing. (Dkt. No. 106 at 17). Thus, the only remaining issue is whether the disputed terms require the connector to capable of being connected and disconnected. The intrinsic evidence indicates the claims do not require a connector that is capable of being "disconnected," as Defendants propose.

Claim 1 recites "a first connector electrically connectable to a car stereo; a second connector electrically connectable to an after-market audio device external to the car stereo; a third connector electrically connectable to one or more auxiliary input sources external to the car stereo and the after-market audio device." The plain language of the claim requires the connector to be "electrically connectable" but does not require the connector to be "disconnected."

Furthermore, the specification discloses an embodiment of the interface that has ports for connecting the car stereo and the after-market device to the interface. '786 Patent at col. 8, l. 31– col. 9, l. 21. But this illustrative circuit diagram is just one exemplary embodiment. Moreover, the embodiment should not be read to teach that the connector must be capable of being "disconnected." The terms "connectable" or "connector" are well-known to those of ordinary skill in the art, and were not redefined by one exemplary embodiment.

Likewise, claim 57 recites "a first electrical connector connectable to a car stereo; a second electrical connector connectable to a portable MP3 player external to the car stereo an interface connected between said first and second electrical connectors for transmitting audio from a portable MP3 player to a car stereo." Contrary to Defendants' contention, this use of "connectable" does not require a connector that is able to be disconnected. It only requires a connector that can be electrically connected.

Defendants argue that during prosecution, Mr. Marlowe distinguished a prior art reference that "only discloses customized, detachable units which are connectable at one or more locations in a vehicle . . . ." (Dkt. No. 101 at 36) (citing Dkt. No. 101-27 at 6). The Court disagrees with Defendants' characterization of the prosecution history. In characterizing the Miyazaki units as detachable, the patentee was not disavowing claim scope by distinguishing the prior art. The patentee explained that the device claimed by Miyazaki is a "detachable unit [that] includes a disk changer, a switch unit and a multiplex control unit" or a "liquid crystal screen and an associated switch and speaker, wherein the disk changer uploads map data to the car navigation control unit." Dkt. 101-27 at 3. The patentee went on to explain that "[t]he system of Miyazaki is entirely unconcerned with allowing an external audio or video device, which is normally incompatible with a car stereo, to operate with a car stereo." *Id.* at 6. In other words,

the patentee did not distinguish the prior art based on the recited "connector," but instead distinguished the prior art based on it failing to allow an incompatible external device to operate with a car stereo. Accordingly, the Court rejects Defendants' "capable of being disconnected" construction, and finds that the disputed terms should be given their plain and ordinary meaning.

### c) Court's Construction

The terms **"connector electrically connectable to," "electrical connector,"** and **"connectable"** will be given their plain and ordinary meaning.

## 13. Claims 49 and 73 of the '342 Patent do not Claim Two Statutory Categories

### a) The Parties' Positions

Defendants contend claims 49 and 73 of the '342 Patent are indefinite because they improperly include method steps in apparatus claims. (Dkt. No. 101 at 38). Defendants argue that the Federal Circuit has found claim language indefinite when it claims both a system and a method of using the system because it is unclear how the claim is infringed. (*Id.* at 39) (citing *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005); *H-W Tech., L.C. v. Overstock.com, Inc.*, 758 F.3d 1329, 1335-36 (Fed. Cir. 2014)).

Defendants contend claims 49 and 73 are each directed to a system but include at least one method step requiring "a user selecting" an audio file using controls of the car audio/video system. (Dkt. No. 101 at 40). Defendants further contend the '342 Patent states that the purpose of the "multimedia device integration system" is to connect external multimedia devices to an existing car audio/video system and allow "a user" to control the devices using the car audio/video system's controls. (*Id.* at 40) (citing '342 Patent at col. 2, ll. 33–39, col. 8, l. 63–col. 9, l. 3). Defendants argue by including limitations directed to a user's action of selecting audio files using the controls of a car audio/video system, the patentee recited method steps that can

only be infringed when a user uses the claimed multimedia system for "selecting." (Dkt. No. 101 at 40).

Plaintiff replies that the disputed claim language permissibly describes the capabilities of the claimed apparatus. (Dkt. No. 106 at 18) (citing *Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1374 (Fed. Cir. 2008)). Plaintiff argues claims 49 and 73 describe the functionality of the apparatus that is invoked "in response to a user selecting the audio file using controls of the car audio/video system." (Dkt. No. 106 at 19). Plaintiff contends the claims do not cover the user's selection of the audio file, but rather a device that performs certain functions when the user makes a selection. (*Id.*). According to Plaintiff, "Infringement occurs when a device that has the capability of performing the steps described [by claims 49 and 73] is manufactured and sold." (*Id.*).

Plaintiff argues that whether a user actually selects the audio file "presented by the infringing device is of absolutely no import. (*Id.*). Plaintiff also contends the process initiated by [selecting the audio file] need never take place. (*Id.*). According to Plaintiff, if the device presents [an option to select an audio file from a portable device using the car audio/video controls], the device is infringing. (*Id.*).

For the following reasons, the Court finds that claims 49 and 73 are not indefinite.

### b) Analysis

The Court finds that claims 49 and 73 do not include method steps in an apparatus claim, but instead recite the capabilities of the claimed apparatus. *Yodlee, Inc. v. Cashedge, Inc.*, 2006 U.S. Dist. LEXIS 86699, *11, *18 (N.D. Cal. Nov. 29, 2006) ("The claims simply use active language to describe the capability of the apparatuses; they do not claim the activity itself . . . The *IPXL* rule does not apply 'where the claims require capability, but not actual use."). Claims

49 and 73 describe the functionality of the apparatus that is invoked "in response to a user selecting the audio file using controls of the car audio/video system." The claims do not cover the user's selection of the audio file, but instead a device that performs certain functions when the user makes a selection. In other words, the claims do not require a user to actually select the audio file, but instead require the integration subsystem to instruct the portable device to play an audio file if one is selected by a user. Indeed, the process initiated by selecting the audio file is not a required step of the claims. The claims only require the device to present an option to select an audio file from a portable device using the car audio/video controls to a user.

### c) Court's Construction

The Court finds that claims 49 and 73 are not indefinite.

## V.  CONCLUSION

The Court adopts the above constructions. The parties are ordered to not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any part of this opinion, other than the definitions adopted by the Court, in the presence of the jury. However, the parties are reminded that the testimony of any witness is bound by the Court's reasoning in this order but any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**It is SO ORDERED.**

**SIGNED this 12th day of September, 2016.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE